**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

WARDELL NELSON JOINER, Jr.,

                                        Petitioner,

v.

JOHN SUTTON, Warden,

                                        Respondent.

Case No.:  16cv2841 GPC (BGS)

**REPORT AND RECOMMENDATION FOR ORDER GRANTING RESPONDENT'S MOTION TO DISMISS PETITION FOR WRIT OF HABEAS CORPUS**

**[ECF NO. 15]**

## I.      INTRODUCTION

Petitioner Wardell Nelson Joiner Jr. ("Joiner"), a state prisoner proceeding *pro se*, filed a Petition for Writ of Habeas Corpus ("Petition") pursuant to 28 U.S.C. § 2254, challenging his conviction in San Diego County Superior Court case number SCN174120. (ECF No. 1.[1])  Respondent contends the Petition is time-barred under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") and therefore should be dismissed with prejudice.  (ECF No. 15. at 1-2.)  Joiner's opposition to the motion ("Opposition")

---

[1] The Court cites the CM/ECF pagination when referencing the Petition and attached exhibits (ECF No. 1), Respondent's Motion to Dismiss (ECF No. 15) and Joiner's Opposition (ECF No. 17.)  Page citations as lodgments reference the lodgment's pagination unless otherwise noted.

was filed on June 2, 2017. (ECF No. 17.)  In his Opposition he also requests an evidentiary hearing.  (*Id.* at 7, 14.)    Based on the documents and evidence presented, and for the reasons set forth below, the Court **RECOMMENDS** that the Motion to Dismiss (ECF No. 15) be **GRANTED** and that this action be **DISMISSED** with prejudice.

## II.    FACTUAL BACKGROUND[2]

Wardell Nelson Joiner, Jr. ("Joiner") and Vanessa Messner ("Messner" or "the victim") began dating when they were both enlisted personnel in the Marine Corps and deployed to Kuwait and Iraq during 2003.  (Lodgment 8 at 2.)  While stationed in Iraq, they became engaged to be married.  Upon Messner's return to the United States in August or September 2003, she lived with Joiner in an apartment in Fallbrook.  By February 2004, their relationship was ending.  (*Id.*)

On February 11, 2004, Messner did not show up "for a 6:00 p.m. appointment to attend a party with some friends", including a marine she was dating.  She had confirmed an hour earlier that she would meet them at a designated place.  Despite phoning her repeatedly, Messner's friends received no response.  (*Id.* at 3.)

Records and photographs from a Bank of America located in Oceanside show that Joiner used Messner's A.T.M. card to withdraw money from her credit union account at approximately 7:30 p.m. that night.  Per a waitress at McCabe's Beach Club in Oceanside, Joiner was at the bar that night.  She first saw him "after happy hour, so approximately anywhere from 6:00 to 7:30" p.m.  He was there having drinks and watching television until between 10:00 and 10:45 p.m.  He appeared depressed, stressed and preoccupied: he told the waitress he and his girlfriend were breaking up due to her seeing someone else and that during a fight earlier that night, she had stabbed him in the leg.  When the waitress told

---

[2] The facts set forth in this section are drawn from the California Court of Appeal's decision on direct appeal (Lodgment 8 at 2-11.)  Such factual findings are presumed correct.  28 U.S.C. § 2254(e)(1) (state court factual findings are presumed correct, unless rebutted by clear and convincing evidence).  Additionally, the Court has conducted its own full review of the state court record.

Joiner to report the incident to the police and seek medical aid, he nodded but said nothing. (*Id.*)

After leaving McCabe's, Joiner went to his friend Marine Sergeant Ron Current's home and they played video games. Joiner told Current he fought with Messner at about 6:00 p.m. and she stabbed him because he was trying to take away her truck keys so she would not drive drunk. Current told Joiner to call the police, but Joiner refused. Eventually, Current phoned 911 and began to report the incident. The dispatcher asked to speak with Joiner, who only spoke with the dispatcher briefly due to his difficulty speaking. Current finished filing the report and was advised that a police officer would contact Joiner at Current's home. (*Id.* at 3-4.)

At approximately 11:30 p.m., Sheriff Deputy Daniel Perkins was called and told to contact Joiner. He telephoned Current's house and spoke with Joiner, who informed him that between 5:30 and 6:00 p.m., Messner stabbed him with a steak knife when he stood in the doorway to stop her from leaving. She said she would spend the night elsewhere and went to get her clothes from inside. Joiner stated that he had left the apartment and he had left afterwards. (*Id.* at 4.) Notably, Joiner told Current that his fight with Messner had a different resolution: that he left her on the floor in the hallway of their apartment. (*See* Lodgment 1 at 321, 327-330 [Current's testimony that Joiner said during the altercation "he pretty much pushed her down and left the premises"]; *also* Lodgment 8 at 4 n.2.)

Perkins asked Joiner to come to the police station to document his wound, but he said he could not do so that night. Perkins called Messner a few times but received no response. He also drove to her apartment and knocked on the door, but no one answered. He testified that the lights were not on in the apartment. (Lodgment 8 at 4.)

Messner did not show up to work on the morning of February 12, 2004. Messner's friend and her platoon sergeant went to her apartment to check on her. Her truck was on the premises, the door was locked, and no one answered their calls. They peered through a window and it appeared a bathroom light was on. They then called the police. (*Id.*)

At approximately 10:15 a.m., Deputy Sherriff Jeffrey Schmidt and other deputies responded to a call to check on Messner. They met her platoon sergeant there, knocked on the apartment doors and windows and received no response. They then obtained a pass key from the apartment manager to the unit. In the bathroom, they discovered Messner's body submerged in the water in the bathtub. "Her face was covered by a small, circular-shaped film of foam. Her hands were wrinkled, indicating she had been in the water for considerable time. There was no water on the floor, and no signs of a struggle." (*Id.* at 5.)

At approximately, 11:00 a.m., Detective Patrick Gardner was called to Messner's apartment to investigate her death. After obtaining a search warrant, investigation of the crime scene began at 6:49 p.m., during which the detectives found the home phone was working and there was no sign of forcible entry into the apartment. Further, a search of Joiner's car revealed several of Messner's identification cards, including her driver's license and Marine Corps ordnance card.

As part of the investigation, Detective James Walker examined Joiner that same day. He did not find a "stab wound," but rather a "very tiny, just a little scrape" on Joiner's left thigh. There were no defensive marks on Joiner's body, which was contrary to the detective's expectation given Joiner's claim Messner stabbed him. Detective Walker testified that Joiner had on his person the following: (1) the keys to Messner's truck; (2) Messner's A.T.M card; and (3) $43.86 in cash. (*Id.* at 5.)

At approximately, 1:00 p.m. that day, Dr. Glenn Wagner, Chief Medical Examiner for San Diego County, was called regarding Messner's death. He arrived at the crime scene at 9:30 p.m. Upon removing Messner's body from the tub, Dr. Wagner noticed that although her body was in rigor mortis, there was great mobility in her neck which was broken. He found bruised on her neck consistent with strangulation and wringing of the neck. Additionally, he found bruising on her wrist, biceps, right hip, as well as lacerations on her lips. (*Id.* at 6.)

Dr. Wagner testified Messner's broken neck would have produced instant paralysis but not death: "In the absence of anything else, we would fuse that area, and eventually sensation would return to the spinal cord. This injury itself isn't a fatal injury."

Dr. Wagner could not determine whether Messner was awake or conscious when placed in the tub. He testified that Messner died by drowning, as evidenced by the pulmonary edema or foam in the bathtub, which indicated she was alive when placed in the water. Per Dr. Wagner's testimony, death by drowning involves "a period of panic and gasping, which can be quite long, a minute and a half or longer, followed by an area of quietness and then convulsions followed by death. In most cases . . . unconsciousness takes anywhere from three to ten minutes, and death occurs in 13 minutes."

Dr. Wagner testified that Messner's death "most likely, occurred either late in the evening of [February 11] or possibly in the morning hours of the 12th of February." He added, "It could certainly be three or four hours on either side" of that estimate. (*Id.* at 6.)

## III.   PROCEDURAL BACKGROUND

### A. Trial and Direct Appeal

On April 22, 2005, a jury convicted Joiner of first degree murder and found the special circumstance of intentional infliction of torture pursuant to California Penal Code §§ 187(a), 190.2(a)(18). (Lodgment 8 at 1-2.) The jury deliberated for less than two hours before reaching their verdict. (*See* Lodgment 3 at 272-72.) Joiner was sentenced to a term of life without the possibility of parole and had a parole revocation restitution fine under section 1202.45 imposed. He brought a motion for a new trial on September 30, 2005 based on alleged prosecutorial misconduct and sought dismissal of the special allegation because of insufficient evidence. (Lodgment 8 at 2; Lodgment 3 at 194-202.) The court denied the motion ruling that there was no misconduct and the special circumstance was supported by sufficient evidence. (Lodgment 8 at 2; Lodgment 1 at 700-14.)

On June 22, 2006, Joiner appealed his conviction contending: (1) the prosecutor committed prosecutorial misconduct during closing argument; (2) the permissive inference in CALJIC No. 2.50.02 violated Joiner's due process; (3) the special circumstance finding

of torture should be reversed based on trial counsel's failure to object to a hearsay statement during a videotaped experiment simulating the circumstances of the murder; and (4) the trial court erred in ordering a parole restitution fine per section 1202.45. (Lodgment 5; Lodgment 8 at 2, 14-23.) The California Court of Appeal affirmed the judgment but remanded the matter to the trial court with instruction to strike the parole revocation restitution fine as Joiner is ineligible for parole. (Lodgment 8 at 23-34.)

In its discussion of Joiner's prosecutorial misconduct claim, the California Court of Appeal held that there was overwhelming evidence of his guilt:

> Based on the totality of the evidence, we conclude there was overwhelming evidence of Joiner's guilt. Joiner admitted to several individuals that he fought with Messner around 6:00 p.m. on the day she was killed. He even told an officer that he had left her on the floor in the hallway. He used Messner's A.T.M. card to withdraw money. Despite prompting from the waitress at the club, he did not call the police earlier in the evening of February 11th. Also, when he was being in investigated on February 12th, he had in his possession Messner's identification cards, including a driver's license; her A.T.M. card; and her truck keys.
>
> Although different witnesses placed Joiner at specific locations during the evening of February 11, they did not account for the entire time period covered by Dr. Wagner's testimony regarding the time of Messner's death. Dr. Wagner did not give a specific time of death, but stated it could have occurred three or four hours before "late evening" on February 11th. Therefore, the murder could have taken place as early at 6:00 p.m., when Joiner admitted he fought with Messner.
>
> Upon analysis of the overwhelming evidence of guilt, Joiner's alibi proves to be a flimsy construct. . . .

(Lodgment 8 at 17.) Joiner's petition for review was filed with the California Supreme Court on January 18, 2007 and denied on February 21, 2007. (Lodgments 9-10.)

## B. State Habeas Corpus Proceedings

From February 6, 2008 to April 1, 2016, Joiner filed nine habeas petitions in the state trial court, five habeas petitions in the California Court of Appeal, and one habeas

petition in the California Supreme Court.  (*See* Lodgments 11-37.)  However, he did not

file a federal petition until filing the instant Petition on November 9, 2016.[3]  (ECF No. 1.)

Joiner filed his first habeas petition in the trial court on February 6, 2008 in which he claimed infective assistance of his trial counsel due to counsel's failure to locate and interview an alibi witness and failure to call an expert witness regarding the victim's time of death.  (Lodgment 11.)  The Court denied the petition on July 7, 2008.  (Lodgment 12.)

Joiner filed his first habeas petition in the California Court of Appeal on May 31, 2009 in which he claimed that the medical examiner miscalculated the victim's time of death.  (Lodgment 13.)  This petition was denied without prejudice so that Joiner could raise this claim in the trial court first.  (Lodgment 14.)

Joiner filed his second habeas petition in the trial court on February 5, 2010.  He asserted that a miscarriage of justice had occurred and claimed his actual innocence based on evidence regarding the victim's time of death.  (Lodgment 15 [relying on victim's autopsy report and statement of Michael Focke].)  On April 9, 2010, the court denied this second habeas petition as the certificate noting the victim's time of death was not "newly discovered evidence" and did not point "unerringly towards innocence."  (Lodgment 16 at 2.)  The trial court noted that Joiner's efforts to rely on the victim's death certificate and autopsy report which state her official time of death as February 12, 2004 at 10:05 "are baseless" as it is clear that this date and time refer to when the victim's body was found.  (*Id.* at 3.)  Thus, Joiner's claims had no merit.  (*Id.*)

Joiner filed his second habeas petition in the California Court of Appeal on April 22, 2010 again claiming actual innocence based on evidence regarding the victim's time of death.  (Lodgment 17.)  In denying the petition on June 9, 2010, the court found there was

---

[3] A notice of appeal by a *pro se* prisoner is deemed constructively filed at the moment the prisoner delivers it to prison authorities for forwarding to the clerk of court.  *Houston v. Lack*, 487 U.S. 266, 267 (1988).  The *Houston* mailbox rule applies for purposes of calculating the one-year AEDPA limitations period as to a *pro se* prisoner's federal habeas petition and the state court habeas petition that began the period of tolling.  *Anthony v. Cambra*, 236 F.3d 568, 575 (9th Cir. 2000).  The Court applies this principle throughout its discussion of Joiner's filing of state and federal habeas petitions.

"no new exculpatory evidence and the issue of sufficiency of the evidence is not cognizable on habeas corpus. . . . . The evidence showed [the victim's] body was found at approximately 10:00 a.m. on February 12, 2004, and was in rigor mortis. The logical conclusion is Dr. Wagner noted the date and time the body was found in his autopsy report and the Certificate of Death." (Lodgment at 18 at 2.) Further, the Court referred to its prior finding on direct appeal that "there was overwhelming evidence of Joiner's guilt." (*Id.* at 1-2.)

On June 21, 2010, Joiner filed a third habeas petition in the trial court in which he raised the same claims he had raised in his previous petitions to the trial court. (Lodgment 19.) It was denied on July 9, 2010. (Lodgment 20.)

Joiner filed a fourth habeas petition in the trial court on January 18, 2011[4] and then a fifth habeas petition in trial court on February 25, 2011. Both made the same claim of actual innocence as his previously filed petitions. (Lodgments 21-22.)

Joiner then filed his sixth habeas petition in trial court on August 8, 2011. (Lodgment 23.) The court denied the petition as successive on September 8, 2011.[5] (Lodgment 24.)

On October 30, 2011, Joiner filed his third habeas petition in the California Court of Appeal again claiming actual innocence based on a January 8, 2011 investigation. He claimed to have submitted two habeas petitions to the trial court, which had not yet been ruled on. (Lodgment 25 at 6, 14.) The court denied the petition without prejudice on January 31, 2012 subject to refilling once the trial court ruled on Joiner's new contentions. (Lodgment 26.)

---

[4] This petition was not dated. Because it would be reasonable to assume that Joiner delivered his petition to prison officials for mailing, and to assume that it was done prior to the filing date, and because it does not affect the outcome, the undersigned presumes (in Joiner's favor) that his petition was delivered to prison officials for mailing seven days prior to the court-stamp date.

[5] In its September 8, 2011 order denying Joiner's petition as successive, the trial court refers to the petition at issue as his "fourth" petition and does not reference Joiner's earlier petitions (noted above as petitions four and five) filed on January 18, 2011 and February 25, 2011.

16cv2841 GPC (BGS)

Joiner than filed his seventh habeas petition in the trial court[6]; it was denied on April 24, 2012. (Lodgment 27.) In the order denying the petition, the trial court stated that the petition "contains almost identical arguments to those [Joiner] previously made before this Court and the Court of Appeal." (*Id.* at 2.)

On April 17, 2012,[7] Joiner filed a petition for writ of mandate seeking discovery. (Lodgment 28.) The petition was denied without prejudice on May 2, 2012 so that Joiner could show he had made good faith efforts to obtain requested discovery from counsel and was unsuccessful. (Lodgment 29.)

On July 9, 2013, Joiner filed his eighth habeas petition in the trial court, which was denied on November 14, 2013. (Lodgments 30-31.)

On December 1, 2014,[8] Joiner filed a ninth petition in the trial court. (Lodgment 32.) In this petition, Joiner for the first time relied on a newly created report by Cindy Balch, R.N., which he also relies on in the instant federal Petition, as "newly discovered evidence which demonstrates his factual innocence." (Lodgment 32 at 60-68, Ex. B; Lodgment 33 at 2.) This document "questions the victim's time of death, as well as various other aspects of the evidence in this case." (Lodgment 33 at 2.) The trial court denied the petition as none of the "newly discovered" evidence presented by Joiner undermined his conviction or pointed "unerringly to innocence or reduced culpability." (Lodgment 33.)

---

[6] Respondent acknowledges that despite repeated requests, he has been unable to obtain a copy of this specific habeas petition filed in the trial court. (ECF No. 15-1 at 21.) However, he was able to obtain a copy of the order denying the petition. (Lodgment 27.)

[7] This petition was not dated. Because it would be reasonable to assume that Joiner delivered his petition to prison officials for mailing, and to assume that it was done prior to the filing date, and because it does not affect the outcome, the undersigned presumes (in Joiner's favor) that his petition was delivered to prison officials for mailing seven days prior to the court-stamp date.

[8] This petition was not dated. Because it would be reasonable to assume that Joiner delivered his petition to prison officials for mailing, and to assume that it was done prior to the filing date, and because it does not affect the outcome, the undersigned presumes (in Joiner's favor) that his petition was delivered to prison officials for mailing seven days prior to the court-stamp date.

Joiner then filed his fifth habeas petition in the California Court of Appeal on October 1, 2015.[9] (Lodgment 34.) This petition made the same claims regarding his actual innocence relying on the report by Cindy Balch, RN.[10] (*Id.* at 4-5, 14-15, 24-25, and Ex. B [beginning on page 38].) On October 9, 2015, the court denied the petition finding it was barred as untimely given that it was filed more than ten years after Joiner was sentenced without an adequate explanation for the delay.[11] (Lodgment 35.)

Finally, Joiner filed a habeas petition on April 1, 2016 in the California Supreme Court raising the same claims as his prior habeas petition in the California Court of Appeal. (Lodgment 36.) In this petition, he included a claim alleging that constitutional error deprived the jury of critical evidence that would have established his innocence regarding the victim's time of death and invoked the "new report" of Cindy Balch, RN. (*Id.* at 46-48 [referenced as attached Exhibit B].) The petition was summarily denied on June 29, 2016. (Lodgment 37.)

**C. The Instant Federal Habeas Corpus Petition**

On November 9, 2016, Joiner filed the instant federal habeas Petition.[12] (ECF No. 1.) On May 2, 2017, Respondent moved to dismiss the Petition on the basis that it is

---

[9] This petition was not dated. Because it would be reasonable to assume that Joiner delivered his petition to prison officials for mailing, and to assume that it was done prior to the filing date, and because it does not affect the outcome, the undersigned presumes (in Joiner's favor) that his petition was delivered to prison officials for mailing seven days prior to the court-stamp date.

[10] The petition also raised numerous other claims: (1) ineffective assistance of trial counsel for failing to investigate and present exculpatory evidence and witnesses; (2) cumulative ineffective assistance of counsel; (3) the prosecution failed to disclose impeaching and exculpatory evidence; (4) cumulative prosecutorial misconduct; (5) petitioner was denied meaningful review of claims raised in habeas petition; and (6) cumulative error. (Lodgment 34.)

[11] The court found the petition further barred because: (1) the claims had been raised and rejected on appeal; (2) the claims could have been raised on direct appeal but were not; (3) the claims were raised and rejected in a prior habeas corpus petition; or (4) the claims could have been raised in a prior petition but were not. (Lodgment 35 at 2.)

[12] In addition to his claim that "constitutional error deprived the jury of critical evidence that would have established [Joiner's] innocence," the Petition sets forth the following claims: (1) ineffective assistance of trial counsel for failing to retain an expert to investigate the victim's time of death; (2) ineffective assistance of trial counsel for failure to impeach the prosecution's expert witness regarding victim's time of death; (3) ineffective assistance of trial counsel for failing to investigate and introduce exculpatory

untimely under the AEDPA and lodged the state court record.  (ECF Nos. 15-16.)  On June 2, 2017, Joiner filed his Opposition to the motion to dismiss.  (ECF No. 17.)

## IV.  DISCUSSION

### A. The Petition Is Barred By The Statute Of Limitations Under AEDPA

#### 1.  The AEDPA's One-Year Statute of Limitations

The instant petition was filed after April 24, 1996 and is subject to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  The AEDPA provides a one-year statute of limitations for filing a habeas corpus petition in federal court.  *Pace v. DiGuglielmo*, 544 U.S. 408, 410 (2005) (citing 28 U.S.C. § 2244(d)(1)).  The enactment of the AEDPA amended 28 U.S.C. § 2244 by adding the following section:

> (d)(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of
>
> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.
>
> (2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or

---

evidence and witnesses; (4) ineffective assistance of trial counsel for failing to object to a jury instruction regarding prior domestic violence acts; (5) cumulative ineffective assistance of counsel; (6) presentation of false evidence by prosecutor in calling the medical examiner who gave the victim's time of death; (7) a second claim of presentation of false evidence regarding victim's time of death; (8) cumulative prosecutorial misconduct; (9) Joiner was denied meaningful review of claims raised in state habeas petitions; and (10) cumulative error. (ECF No. 1 at 24-25.)

16cv2841 GPC (BGS)

claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d)(1)-(2).  Here, subparagraphs (B) through (D) are not applicable to Joiner.  He has provided no argument or evidence that there were state impediments preventing him from seeking further relief, that his claims rely on a new constitutional right, or that the factual predicate for his claims was unknown at the time his conviction became final.

## 2.  Commencement of the One-Year Statute of Limitations

Under the AEDPA, Joiner had one year from the date his conviction became final to file a petition for writ of habeas corpus in federal court.  *Calderon v. U.S. District Court*, 128 F.3d 1283, 1286-87 (9th Cir. 1997), *as amended on denial of rhg. and rhg. en banc, cert. denied,* 522 U.S. 1099 (1998), *overruled on other grounds by Calderon v. U.S. District Court*, 163 F.3d 530 (9th Cir. 1998), *cert. denied*, 523 U.S. 1063 (1999).  In California, a petitioner's conviction becomes final ninety (90) days after the California Supreme Court denies a petition for direct review.  *Bowen v. Roe*, 188 F.3d 1157, 1158-59 (9th Cir. 1999).

Joiner challenged his conviction on direct appeal to the California Court of Appeal, Fourth District, Division One.  (Lodgments 5, 7.)  The Court affirmed Joiner's conviction on December 12, 2006.  (Lodgment 8.)  The California Supreme Court denied Joiner's petition for review on February 21, 2007.  (Lodgment 10.)  After ninety days, on May 22, 2007, Joiner's conviction became final.  *See Bowen*, 188 F.3d at 1158-59 (finding that because direct review of a conviction includes the ninety-day period within which a petitioner could have filed a petition for a writ of certiorari from the United States Supreme Court, AEDPA's one year limitations period begins to run on the date that ninety-day period expires).  Pursuant to section 2244(d), the statute of limitations for federal habeas corpus relief began to run on May 23, 2007, the day after the judgment became final.  *See* 28 U.S.C. § 2244(d)(1); *Corjasso v. Ayers*, 278 F.3d 874, 877 (9th Cir. 2002) (explaining that the one-year statute of limitations under AEDPA begins to run the day after the

conviction becomes final). The one year statute of limitations expired one year later on May 23, 2008. Petitioner filed his habeas petition in federal court on November 9, 2016, *over eight years* past the May 23, 2008 deadline. (*See* ECF No. 1 at 20-21.) Unless Joiner is entitled to statutory or equitable tolling, his action is barred by AEDPA's statute of limitations. *See Calderon*, 128 F.3d at 1288 (AEDPA's statute of limitations may be subject to both statutory and equitable tolling). Accordingly, the Court will need to determine whether Joiner qualifies for any tolling of the one-year limitations period.

### 3. Statutory Tolling

The AEDPA applies to all federal habeas corpus petitions filed after its enactment in 1996. *See Patterson v. Stewart*, 215 F.3d 1243, 1246 (9th Cir. 2001). The AEDPA tolls the one-year statute of limitations period for the amount of time a "properly filed application for State post-conviction or other collateral review" is pending in state court. 28 U.S.C. § 2244(d)(2); *Nino v. Galaza*, 183 F.3d 1003, 1005 (9th Cir. 1999), *overruled on other grounds by Carey v. Saffold*, 536 U.S. 214 (2002). A petitioner "bears the burden of proving that the statute of limitations was tolled." *Banjo v. Ayers*, 614 F.3d 964, 967 (9th Cir. 2010). A state prisoner who unreasonably delays in filing a state habeas petition is not entitled to statutory tolling because the petition is not considered "pending" or "properly filed" within the meaning of section 2244(d)(2). *Nedds v. Calderon*, 678 F.3d 777, 780 (9th Cir. 2012) (quoting *Carey v. Saffold*, 536 U.S. 214 (2002)).

The statute of limitations is not tolled from the time a final decision is issued on direct state appeal and the time the first state collateral challenge is filed because there is no case "pending" during that interval. *Porter v. Ollison*, 620 F.3d 952, 958 (9th Cir. 2010); *Nino*, 183 F.3d at 1006. An application for state post-conviction review is considered "pending" during the interval between the lower state court's adverse decision and the prisoner's filing of a notice of appeal in the higher state court, provided that the filing of that notice is timely under state law. *Carey*, 536 U.S. at 222-25; *see Chaffer v. Prosper*, 592 F.3d 1046, 1048 (9th Cir. 2010) (per curiam) (Under California's indeterminate timeliness rule, "[a]s long as the prisoner filed a petition for appellate review

within a 'reasonable time,' he c[an] count as 'pending' (and add to the 1-year time limit) the days between (1) the time the lower state court reached an adverse decision, and (2) the day he filed a petition in the higher state court.")

In California, where habeas decisions are not appealed but may be filed originally in each court, "pending" includes a reasonable time, such as thirty to sixty days, between a decision and a subsequent filing. *Evans v. Chavis*, 546 U.S. 189, 201 (2006) (holding that an unjustified and unexplained six-month delay is presumptively unreasonable). Further, state habeas petitions filed after the one-year statute of limitations has expired do not revive the statute of limitations and have no tolling effect. *Ferguson v. Palmateer*, 321 F.3d 820, 823 (9th Cir. 2003) ("section 2244(d) does not permit the reinitiation of the limitations period that has ended before the state petition was filed"); *Jiminez v. Rice*, 276 F.3d 478, 482 (9th Cir. 2001).

Joiner concedes that he is not entitled to have his Petition be considered timely based on statutory tolling. In his Opposition, he makes clear that "[R]espondent *erroneously contends* that this petitioner claims that statutory or equitable tolling makes this petition timely. This petitioner maintains that a 'fundamental miscarriage of justice' warrants consideration of the untimely petition." (ECF No. 17 at 6-7 [emphasis added].) Thus, Joiner is not asserting that he is entitled to statutory tolling.

Even a cursory review of Joiner's state habeas petition filings makes it clear that there is insufficient statutory tolling to make his federal Petition timely. As noted above, Joiner's conviction became final on May 22, 2007. The AEDPA one-year statute of limitations began to run on May 23, 2007 and expired on May 23, 2008. Joiner did not file his first state habeas petition in the trial court until February 6, 2008. (Lodgment 11.) As there is no tolling from the date of finality, May 23, 2007, until the filing of the first state petition, February 6, 2008, 260 days of the one-year limitations period expired; this left Joiner with 105 remaining days to file a federal habeas petition. *See Porter*, 620 F.3d at 958; *Nino*, 183 F.3d at 1006.

Joiner's first state habeas petition was denied on July 7, 2008. (Lodgment 12). However, 328 days elapsed between July 7, 2008 and the filing of his next state habeas petition with the California Court of Appeal on May 31, 2009. (Lodgment 13.) This gap of time is too large to provide Joiner with tolling. *See Evans*, 546 U.S. at 201 (noting that most states provide "30 to 60 days" for filing an appeal); *Chaffer*, 592 F.3d at 1048 (finding no interval tolling for unexplained 115 day gap between denial of habeas petition in the trial court and filing of habeas petition in the California Court of Appeal).

As this 328 days far exceeds the 105 remaining days Joiner had left to file his federal Petition, the one year limitations period for him to file a federal habeas petition had already expired by the time he filed his May 31, 2009 habeas petition with the California Court of Appeal. Further, because state habeas petitions filed after the one-year statute of limitations has expired do not revive the statute of limitations and have no tolling effect, *Ferguson*, 321 F.3d at 823, Joiner's subsequent state habeas petitions have no tolling effect. Thus, statutory tolling does not permit Joiner's federal Petition, which was not filed until November 9, 2016, to be considered timely. (*See* ECF No. 1.)

### 4. Equitable Tolling

The AEDPA's one-year statute of limitations may be subject to equitable tolling in appropriate cases. *Holland v. Florida*, 560 U.S. 631, 645 (2010). To be entitled to equitable tolling, a habeas petitioner has the burden to establish two elements: (1) "he has been pursuing his rights diligently," and (2) "some extraordinary circumstance stood in his way." *Id.* at 649 (citing *Pace*, 544 U.S. at 418).

Joiner is not relying on either of the above grounds to request a period of equitable tolling. He again concedes that he is not entitled to equitable tolling. As noted above, he makes clear in his Opposition that "[R]espondent *erroneously contends* that this petitioner claims that statutory or equitable tolling makes this petition timely. This petitioner maintains that a 'fundamental miscarriage of justice' warrants consideration of the untimely petition." (ECF No. 17 at 6-7 [emphasis added].) Thus, Joiner claims he is actually innocent, and therefore, the actual innocence equitable exception to AEDPA's

statute of limitations should allow him to have his claims reviewed. (*Id.* at 8-16.) The Court must consider whether Joiner presents sufficient new evidence of actual innocence to excuse his untimely filing and permit review of his constitutional claims on the merits.

## B. Actual Innocence Exception

In rare and extraordinary circumstances, a plea of actual innocence can serve as a gateway through which a petitioner may pass to overcome the one-year statute of limitations applicable to federal habeas petitions under AEDPA. *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013); *see also Lee v. Lampert*, 653 F.3d 929, 934-37 (9th Cir. 2011) (en banc). To show actual innocence, the petitioner must meet the threshold requirement set forth in *Schlup v. Delo*, 513 U.S. 298 (1995). This requires a petitioner to "support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 324. Such evidence need not be newly discovered, but it must be "newly presented", meaning that it was not before the trial court. *See Griffin v. Johnson*, 350 F.3d 956, 961-63 (9th Cir. 2003).

Further, a petitioner must "persuade[ ] the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *McQuiggin*, 569 U.S. at 386 (quoting *Schlup*, 513 U.S. at 329 [noting the miscarriage of justice exception only applies to cases in which new evidence shows "it is more likely than not that no reasonable juror would have convicted the petitioner"]); *see also House v. Bell*, 547 U.S. 518, 538 (2006) (emphasizing that the *Schlup* standard is demanding and seldom met). This exacting standard "permits review only in the extraordinary case, but it does not require absolute certainty about the petitioner's guilt or innocence." *Larsen v. Soto*, 742 F.3d 1083, 1095 (9th Cir. 2013) (quoting *Schlup*, 513 U.S. at 321). Critically, "actual innocence," for purposes of *Schlup*, "means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998).

A petitioner's new evidence must be "so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of

nonharmless constitutional error." *Schlup*, 513 U.S. at 316. The habeas court considers all evidence, both old and new, incriminating and exculpatory, admissible at trial or not, and based, "[o]n this complete record, the court makes a probabilistic determination about what reasonable, properly instructed jurors would do." *Lee*, 653 F.3d at 938 (internal quotations omitted). "Unexplained delay in presenting new evidence bears on the determination whether the petitioner has made the requisite showing" required by *Schlup*. *McQuiggin*, 569 U.S. at 399; *see Schlup*, 513 U.S. at 322 ("[a] court may consider how the timing of the submission and the likely credibility of [a petitioner's] affiants bear on the probable reliability of ... evidence [of actual innocence].")

Precedent holding that a petitioner has satisfied the *Schlup* standard has "typically involved dramatic new evidence of innocence", such as DNA evidence or a prosecution's chief witness's subsequent open court confession that he was the perpetrator of the murder for which the petitioner had been convicted. *Larsen*, 742 F.3d at 1096. In contrast, access to the *Schlup* gateway has been denied where "a petitioner's evidence was merely cumulative or speculative or was insufficient to overcome otherwise convincing proof of guilt." *Id.* (citing as examples *Lee*, 653 F.3d at 943-46 and *Sistrunk v. Armenakis*, 292 F.3d 669, 675-77 (9th Cir. 2002) (en banc)).

### 1. Analysis

Having reviewed the entirety of the evidence, the Court concludes that Joiner's claim of actual innocence does not satisfy the requirements to pass through the *Schlup* gateway to have his constitutional claims heard on the merits. The "newly presented evidence"[13] he relies on in an attempt to demonstrate his actual innocence is precisely the type of evidence that is "merely cumulative . . . speculative . . .[and] insufficient to overcome

---

[13] Because it does not affect the outcome, the undersigned has assumed *arguendo* that the new evidence provided by Joiner may qualify as "newly presented" evidence of actual innocence for purposes of the *Schlup* gateway. *See Griffin*, 350 F.3d at 963 (*Schlup* gateway claims require only "newly presented" evidence of actual innocence; hospital records that were in petitioner's possession, but not presented at trial court prior to accepting plea bargain qualified as "newly presented" evidence for purposes of the *Schlup* gateway).

otherwise convincing proof of guilt." *See Larsen*, 742 F.3d at 1096. Here, Joiner argues that "the central forensic proof connecting [him] to the crime has been called into question" by the following "newly presented evidence":

(1) the victim's autopsy report completed by Dr. Wagner listing the victim's time of death as February 12, 2004 at 10:05 a.m. (ECF No. 17 at 8 [citing ECF No. 1, Ex. A]);

(2) a report by Nurse Cindy Balch dated September 9, 2014, over ten years after the victim's death, that questions the victim's time of death, as well as various other aspects of the evidence in this case[14] (*Id.* at 9 [citing ECF No. 1, Ex. B]);

(3) an affidavit of a supposedly exculpatory witness, Michael Focke, stating he spoke with the victim on February 11, 2004 between 6:00 p.m. and 7:00 p.m. (*Id.* at 9-10 [citing ECF No. 1, Ex. E]);

(4) a report from a private investigator who timed the drive between the Fallbrook apartment where the victim was found and McCabe's bar in Oceanside on December 1, 2010 (*Id.* at 10 [*see* ECF No. 1, Ex. G]);

(5) A February 12, 2004 investigative police report stating that a window in the apartment bedroom was not locked (*Id.* at 10 [citing ECF No. 1, Ex. K]); and

(6) an affidavit from a friend of Joiner stating he was willing to testify that during an incident of prior domestic violence between Joiner and the victim discussed at trial, he saw the victim attempt to hit Joiner (*Id.* at 10-11 [citing ECF No. 1, Ex. I]).

Joiner uses this evidence to support his arguments that (a) the victim was alive after he left the apartment; (b) testimony at trial regarding the victim's time of death was unreliable and biased based on the time of death noted on the death certificate and autopsy

---

[14] Many issues raised by Nurse Cindy Balch are outside the scope of the medical field. (*See* ECF No. 1, Ex. B [e.g., "case is all circumstantial evidence"; "bathroom light was on which infers someone in the apartment turned the light on after the police checked the apartment on 2/11"; prosecutor did not "explore the possibility that someone else may have entered by this open bedroom window"; "failure of defendant's attorney to call [witness] which would have established [the victim] was still alive at 19:00"; "every citizen of these United States should be afforded the best possible defense possible to ensure that justice is rendered"].)

report; (c) there was someone else in the apartment based on the fact that a light was on in the apartment; and (d) the evidence against Joiner at trial was weak as there was no DNA evidence or eyewitness accounts linking him to the crime. (*Id.* at 11-12.) As part of Joiner's alibi defense, his counsel argued these points at trial. (*See* Lodgment 1 at 632-59, 661-73 [defense's closing argument].)

Both the trial court and appellate court addressed Joiner's claim of actual innocence in his habeas petitions to those state courts. (Lodgments 33, 35.) Joiner relied on the same evidence in support of this claim as he does now in his federal Petition.[15] (*Compare* ECF No. 1 at 33 [federal habeas petition exhibit list], *with* Lodgment 32 at 74 [state trial court habeas petition exhibit list] *and* Lodgment 34 at x [state appellate court habeas petition exhibit list].) In denying his habeas petition, the San Diego Superior Court stated that even assuming Joiner's evidence is new, it still does not undermine the jury's guilty verdict:

> To the extent that Petitioner refers to evidence which may be considered "newly discovered" [including Nurse Cindy Balch's report questioning the victim's time of death] this evidence does not undermine the prosecution's entire case nor does it point unerringly to innocence or reduce culpability. This is particularly so in light of the appellate Court's finding that "Joiner's alibi proves to be a flimsy construct." (See Appellate Court's Opinion at page 17). Though additional evidence could have been presented, it would not have pointed unerringly to innocence or reduced culpability.

(Lodgment 33 at 2-3.) Consistently throughout his state habeas filings, Joiner has attempted to undercut Dr. Wagner's estimated time of death of the victim. In an order denying one of Joiner's earlier habeas petitions, the California Court of Appeal rebutted Joiner's claim of actual innocence based on the same alleged inaccuracies in Dr. Wagner's autopsy report regarding the victim's time of death that he relies on now:

> Joiner points out the Chief Medical Examiner Glenn N. Wagner, D.O., listed the date and time of death as "February 12, 2004; 1005 hours" on the autopsy report, the Certificate of Death executed by Dr. Wagner lists the "date of death" and the "injury date" as "Fd 02/12/2004 hour 1005," yet Dr. Wagner

---

[15] Joiner also presented the same "new evidence" to in his petition to the California Supreme Court (*see* Lodgment 36); however, that petition was summarily denied. (Lodgment 37.)

testified he estimated [the victim's] death likely occurred either late in the evening on February 11, 2004, or possibly in the morning hours of February 12, 2004. Joiner presented an alibi defendant at trial and claimed someone else strangled and drowned [the victim] in their apartment. The jury rejected Joiner's defense. As we noted on appeal in the context of Joiner's claim of prosecutorial misconduct, there was overwhelming evidence of Joiner's guilt. Joiner does not have any new exculpatory evidence . . . . The evidence showed [the victim's] body was found at approximately 10:00 a.m. on February 12, 2004, and in rigor mortis. The logical conclusion is Dr. Wagner noted the date and time the body was found in his autopsy report and the Certificate of Death.

(Lodgment 18 at 1-2.) Joiner makes clear in his Opposition that he "is not asserting that the time of death on the autopsy report and subsequent death certificate is incorrect. . . . [He] is asserting that Messner died on February 12, 2004 and that [he] could not have committed the murder since [he] never returned to the apartment, had alibi witnesses, and evidence established someone was in the apartment." (ECF No. 17 at 15-16.)

Here, Dr. Wagner's autopsy report for the victim and the statements provided in Nurse Cindy Balch's report challenging the victim's time of death offer nothing beyond that which was presented to the jury by Dr. Wagner's trial testimony and defense counsel's closing argument. In his testimony at trial, Dr. Wagner did not give a specific time of death for the victim, but stated it could have occurred three or four hours before "late evening" on February 11, 2004. (Lodgment 1 at 516-18["the death most likely occurred either late in the evening the night before or possibly in the morning hours of the 12th of February" but "it could certainly be three or four hours on either side of that"].) Therefore, Messner could have been killed as early as 6:00 p.m., when Joiner admitted to multiple individuals that he fought with the victim. The crux of Joiner's alibi defense was based on a challenge to the time of death proffered by Dr. Wagner. (*See* Lodgment 1 at 657-66 [defense counsel arguing in his closing argument that based on Dr. Wagner's testimony as to the science of rigor mortis and the victim's estimated time of death, Joiner could not have been the person who killed the victim].) Thus, the "newly presented evidence" regarding the victim's time

of death, was information and argument the jury had before it and rejected in reaching Joiner's guilty verdict in after less than two hours of deliberation. A nurse's critique of the autopsy report and Dr. Wagner's estimated time of death, over ten years after the victim was killed, is not the type of evidence that would lead a reasonable jury to find Joiner not guilty in light of the overwhelming evidence of guilt in this case. *See Schlup*, 513 U.S. at 322 ("[a] court may consider how the timing of the submission and the likely credibility of [a petitioner's] affiants bear on the probable reliability of ... evidence [of actual innocence]"). As noted by the prosecutor during his closing argument, estimating a person's time of death, even for an individual as credentialed as Dr. Wagner, "is not an exact science." (Lodgment 1 at 675-76.) Accordingly, such evidence attempting to call into question the victim's time of death does not show Joiner's actual innocence and would not be sufficient to convince a reasonable jury that Joiner is not guilty.

Further, none of the other "newly presented evidence" Joiner has used as a basis to allege his actual innocence in his Opposition is sufficient to convince a reasonable jury that he is not guilty. The fact that a window in the bedroom of the victim and Joiner's apartment was unlocked, and the inference that someone else could have come into the apartment to kill Messner, does not prove Joiner's actual innocence. (*See* ECF No. 1 at 116.) This is the type of merely speculative evidence that is insufficient to overcome the otherwise overwhelming proof of guilt in this case. *See Larsen*, 742 F.3d at 1096.

Additionally, the fact that Michael Focke, who Joiner deems an "exculpatory witness", was willing to testify that he remembers speaking with the victim between 6:00 p.m. and 7:00 p.m. the night she was killed does not prove that Joiner is actually innocent. (*See* ECF No.1 at 95-97.) Focke is not providing eye-witness testimony that someone *other* than Joiner killed Messner as has occurred in other instances where a petitioner has passed through the *Schlup* standard by relying on exculpatory witness testimony. *See, e.g.*, *Larsen*, 742 F.3d at 1087-89, 1095-99 (9th Cir. 2013) (affirming district court's finding that petitioner was able to pass through *Schlup* gateway to challenge his possession of a deadly weapon conviction because he set forth credible eye-witness testimony that an individual

other than the petitioner committed the acts for which petitioner was sentenced). While Focke's testimony may call into question the prosecution's timeline for the night of February 11, 2004, other testimony was presented at trial that would contradict his statement. Other witnesses who had plans to meet the victim at 6:00 p.m. that night testified that they spoke with the victim around 5:00 p.m. and that when she did not arrive at the agreed upon time, they tried calling her multiple times, over the course of an hour to an hour and half, to no avail. (Lodgment 1 at 124-25, 254-55.) Further, Joiner's own statements place him with the victim as late as 6:00 p.m. on the night of Messner's death. (*Id.* at 307-08.) Given the overwhelming evidence of guilt in this case, this "exculpatory" witness testimony is not the type of evidence that is sufficient to convince a reasonable juror that Joiner is not guilty.

Further, the fact that a hired investigator documented the drive times for various routes between Joiner's and the victim's shared apartment and the bar McCabe's over six years after the victim was killed does not prove that Joiner is actually innocent. (*See* ECF No. 1 at 103.) The drive times estimated by the investigator do not foreclose the timeline presented by the prosecution. In fact, they align with the estimated travel time provided by the prosecution during closing argument. (*See* Lodgment 1 at 626-27 ("it takes no less than maybe a half hour from Fallbrook to downtown Oceanside", where Joiner withdrew money from Messner's credit union account at 7:30 p.m.). Witnesses placed Joiner at specific locations during the evening of February 11, 2004, but they did not account for the entire time period covered by Dr. Wagner's estimated time of death testimony. (*See id.* at 516-18 [Dr. Wagner's testimony as to the victim's estimated time of death that "the death most likely occurred either late in the evening the night before or possibly in the morning hours of the 12th of February" but "it could certainly be three or four hours on either side of that"].) Thus, once again, this report falls short of being the type of evidence that would permit Joiner to pass through the *Schlup* gateway.

Finally, the fact that one of Joiner's friends was willing to testify that during an incident of prior domestic violence between Joiner and the victim discussed at trial, the

victim tried to hit Joiner during the altercation, does not prove that Joiner is actually innocent. (ECF No. 1 at 110-12.) Other witnesses testified as to the nature of Joiner's relationship with the victim including past instances of possessive and violent behavior. Although most witnesses discussed Joiner's aggression, Ron Current testified that Joiner had recounted to him that Messner "had hit him at [a] party a couple times." (Lodgment 1 at 329.) Thus, evidence provided by an additional friend of Joiner's would be cumulative of the type of domestic violence evidence already considered by the jury in reaching their guilty verdict.

In his Opposition, Joiner attempts to downplay the evidence pointing to his guilt, arguing that there is no physical or forensic evidence tying him to the victim's murder. (*See* ECF No. 17 at 12 [arguing "evidence against this petitioner at trial was weak"].) However, the prosecution presented a host of circumstantial evidence pointing to Joiner's guilt to the jury. And circumstantial evidence alone is sufficient to support a conviction. *See United States v. Jackson*, 72 F.3d 1370, 1381 (9th Cir. 1995) ("Circumstantial evidence and inferences drawn from it may be sufficient to sustain a conviction.").

As noted by the appellate court on his direct appeal, Joiner admitted to multiple individuals that he fought with the victim at 6:00 p.m. on the day she was killed, February 11, 2004, when she allegedly stabbed him at their shared apartment. (Lodgment 1 at 306-08, 320-21, 355-57; Lodgment 4 at 1424 [transcript of 911 call with during which Current relayed Joiner's statement that Messner stabbed him at "about 6"].) He provided conflicting reports of how their fight ended, telling an officer that she left before he did, but telling his friend Current that he left her on the floor in the hallway of their apartment. (*Compare* Lodgment 1 at 307 [Deputy Sherriff Daniel Perkins' testimony that Joiner said after their altercation "she had left, and then he left after that"] *and* Lodgment 4 at 1423 [transcript of 911 call during which Joiner states "I know [Messner] ain't [at the apartment] because she went to a party."], *with* Lodgment 1 at 321, 327 [Current's testimony that Joiner said during the altercation "he pretty much pushed her down and left the premises"].)

Further, Joiner initially told authorities he had gone straight to Current's house following his fight with Messner, when in fact he had gone to McCabe's bar. (*Compare* Lodgment 1 at 307-08, *with* 354 [Joiner first seen at McCabe's between 6:00 to 7:30] *and* 351 [stipulating Joiner was at McCabe's on the night of February 11, 2004].) He used Messner's A.T.M. card to withdraw money from her credit union account later that evening following his fight with her. (*Id.* at 411-13 [A.T.M. accessed from 7:29-30 p.m. in Oceanside, blocks from McCabe's]; 646 [defense counsel's concession during closing argument that "we know where [Joiner] is at 7:30, 7:29, to be exact. It's on camera in Oceanside. You saw the photographs of him at the A.T.M."].) Despite being prompted by a waitress at a bar, he did not call police earlier on the night of February 11, 2004 regarding his fight with Messner to report being stabbing. (*Id.* at 355-57.) He still did not want to make a police report later than night (*Id.* at 323), but Current eventually called the authorities to report the incident on Joiner's behalf, during which Joiner had difficulty speaking (*Id.* at 325; Lodgment 4 at 1423-31 [transcript of 911 call]).

There was no sign of forced entry at the apartment and authorities testified that they had to obtain a key from the apartment manager to enter the apartment because the door was locked. (Lodgment 1 at 76, 413.) Investigators noted scuff marks on the walls in the hallway and bedroom, including a large dent in the bathroom door. (*Id.* at 437, 470.) A knife was found in the bedroom with a bloodstain on it that matched Joiner's DNA. (*Id.* at 403, 405-06, 461-62.) Lastly, when being investigated the day after the victim's murder, Joiner was in possession of the victim's identification cards, including her driver's license, her A.T.M. card, and the keys to her truck. (*Id.* at 368-69.) Joiner offered no evidence at trial. (*Id.* at 569.)

Furthermore, despite Joiner's alibi defense that he was not at the apartment when Messner was killed, the complete state court record shows that Joiner admitted to strangling the victim and placing her in a bathtub. On April 13, 2005, during a motion in limine hearing regarding Joiner's motion to suppress statements he made to law enforcement, Detective James Walker testified to the following:

By Mr Allard [prosecutor]:

Q. Forgive me if I asked this before. I don't remember. In the car, did Mr. Joiner ever make any mention to you that he strangled [the victim], broke her neck, or placed her in a bathtub?

A. No.

Q. Eventually down at the station, after he was advised of his *Miranda* rights, towards the end of that interview, were you able to elicit that information from him, that in fact, he had done that?

A. Yes.

(*Id.* at 14; *see also* Lodgment 3 at 16-19, 46-47 [during an interview after being advised of his *Miranda* rights, Joiner "admitted that he put both hands around [the victim's] neck area and threw her down so her head hit a wall. He finally admitted that he had put the victim in the bathtub, after she was laying motionless on the floor, pulling the stop, filling the tub with water, and then leaving. He claimed that he left the victim's head above water and only filled the tub less than half full . . . ."].) Although these statements were not presented at trial, the trial court denied Joiner's motion to suppress statements he made to law enforcement and thus ruled such statements admissible. (Lodgment 1 at 36.) As it is this Court's role to consider all evidence and make a "probabilistic determination about what reasonable, properly instructed jurors would do" on a "complete record", consideration of such evidence is proper. *See Lee*, 653 F.3d at 938.

In light of Joiner's confession, it is impossible for him to provide *any* new evidence that would satisfy his burden of showing that "no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *See McQuiggin*, 569 U.S. at 386; *Lee*, 653 F.3d at 938 (habeas court considers "all the evidence, old and new, incriminating and exculpatory, admissible at trial or not . . . . [and] on this complete record, the court makes a probabilistic determination about what reasonable, properly instructed jurors would do"); *Majoy v. Roe*, 296 F.3d 770, 776 (9th Cir. 2002) ("petitioner must show that, in light of all the evidence, including evidence not introduced at trial, it is more likely than

not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt"); *Bousley*, 523 U.S. at 623 (actual innocence for purposes of *Schlup*, "means factual innocence").

In short, Joiner's "newly presented evidence" is insufficient to allow him to pass through the *Schlup* gateway and have his constitutional claims heard on the merits. *Lee*, 653 F.3d at 937. Even if the Court considers the evidence that Joiner could have presented at trial, he still cannot meet *Schlu*p's exacting standard. *See Lee*, 653 F.3d at 945. This is not one of the extraordinary cases meriting review of Joiner's otherwise time-barred claims under the actual innocence exception to the statute of limitations. Accordingly, Joiner is not entitled to a tolling of the AEDPA statute of limitations based on his assertion of actual innocence.

## V. REQUEST FOR AN EVIDENTIARY HEARING

Finally, Joiner requests an evidentiary hearing regarding his actual innocence argument. (ECF No. 17 at 14.) An evidentiary hearing may be conducted for an actual innocence claim when it "would produce evidence more reliable or more probative." *Griffin*, 350 F.3d at 966. However, an evidentiary hearing is unnecessary if the petitioner "has failed to show what an evidentiary hearing might reveal of material import on his assertion of actual innocence." *Id.* (quotations and citation omitted).

The Court finds that an evidentiary hearing is not warranted for Joiner's actual innocence claim. As discussed above, even if the new evidence that Joiner proffers is fully credited, it would still not cause the Court to lose confidence in the outcome of his trial. *See Stewart v. Cate*, 757 F.3d 929, 942 (9th Cir. 2014) (finding that a district court may deny a request for evidentiary hearing when new evidence, even if fully credited, would not cause it to lose confidence in outcome of trial); *also Orthel v. Yates*, 795 F.3d 935, 938-41 (9th Cir. 2015) (where district court had an amply developed record full of relevant evidence allowing well-supported ruling concerning asserted basis for tolling, evidentiary hearing unnecessary). Accordingly, the Court **RECOMMENDS** Joiner's request for an evidentiary hearing **BE DENIED**.

16cv2841 GPC (BGS)

## VI.  CONCLUSION AND RECOMMENDATION

For the reasons stated above, **IT IS HEREBY RECOMMENDED** the Court issue an Order: (1) approving and adopting this Report and Recommendation; and (2) granting Respondent's Motion to Dismiss the Petition (ECF No. 15); and (3) directing that judgment be entered dismissing the Petition with prejudice as it is time-barred.

This Report and Recommendation of the undersigned Magistrate Judge is submitted to the United States District Judge assigned to this case, pursuant to 28 U.S.C.§ 636(b)(1).

**IT IS HEREBY ORDERED** that no later than **February 21, 2018**, any party to this action may file written objections with the Court and serve a copy on all parties. The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties by **February 28, 2018**.

The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order.  *Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir 1991)).

**IT IS SO ORDERED.**

Dated:  February 1, 2018

Hon. Bernard G. Skomal
United States Magistrate Judge