UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WARDELL NELSON JOINER, Jr., Pro Se,<br><br>                      Petitioner,<br><br>v.<br><br>JOHN SUTTON, Warden,<br><br>                      Respondent. | Case No.: 3:16-cv-02841-GPC-BGS<br><br>**ORDER ADOPTING IN FULL THE REPORT AND RECOMMENDATION [ECF NO. 22] GRANTING RESPONDENT'S MOTION TO DISMISS PETITION FOR WRIT OF HABEAS CORPUS [ECF NO. 15] AND DENYING A CERTIFICATE OF APPEALABILITY** |

Petitioner Wardell Nelson Joiner, Jr. ("Joiner") is a state prisoner proceeding *pro se*. On November 16, 2016, Joiner filed a Petition for Writ of Habeas Corpus ("Petition") pursuant to 28 U.S.C. § 2254, challenging his murder and torture convictions in San Diego County Superior Court case number SCN174120. (ECF No. 1.[1]) On May 5, 2017, Respondent filed a Motion to Dismiss ("Motion") Joiner's Petition with prejudice, contending the Petition is time-barred under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). (ECF No. 15.) On June 2, 2017, Joiner filed an

---

[1] ECF page citations reference the CM/ECF pagination system. Page citations to Lodgments reference the lodgment's pagination.

Opposition to the Motion ("Opposition"). (ECF No. 17.) In his Opposition, Joiner also requests an evidentiary hearing. (*Id.* at 7, 14.) On February 1, 2018, Magistrate Judge Bernard G. Skomal issued a Report and Recommendation ("Report") recommending Respondent's Motion be granted. (ECF No. 22.) On February 28, 2018, Joiner filed Objections to the Report ("Objections"). (ECF No. 24.) Respondent has not filed a reply to Joiner's Objections. After careful consideration of the pleadings, supporting documents, and applicable law, the Court **OVERRULES** Petitioner's Objections and **ADOPTS IN FULL** the Magistrate Judge's Report **GRANTING** Respondent's Motion to Dismiss.

## I.     FACTUAL BACKGROUND[2]

Wardell Nelson Joiner, Jr. ("Joiner") and Vanessa Messner ("Messner" or "the victim") began dating when they were both enlisted personnel in the Marine Corps and deployed to Kuwait and Iraq during 2003. (Lodgment 8 at 2.) While stationed in Iraq, they became engaged to be married. Upon Messner's return to the United States in August or September 2003, she lived with Joiner in an apartment in Fallbrook. By February 2004, their relationship was ending. (*Id.*)

On February 11, 2004, Messner did not show up "for a 6:00 p.m. appointment to attend a party with some friends," including another marine she was dating. She had confirmed an hour earlier that she would meet them at a designated place. Despite phoning her repeatedly, Messner's friends received no response. (*Id.* at 3.)

Records and photographs from a Bank of America located in Oceanside show that Joiner used Messner's A.T.M. card to withdraw money from her credit union account at approximately 7:30 p.m. that night. Per a waitress at McCabe's Beach Club in Oceanside,

---

[2] After conducting its own full review of the record, this Court recites the facts presented in the Report. The Report draws the facts set forth in this section from the California Court of Appeals' decision on direct appeal (Lodgment 8 at 2-11.) Such factual findings are presumed correct. 28 U.S.C. § 2254(e)(1) (state court factual findings are presumed correct, unless rebutted by clear and convincing evidence).

Joiner was at the bar that night. She first saw him "after happy hour, so approximately anywhere from 6:00 to 7:30" p.m. He was there having drinks and watching television until between 10:00 and 10:45 p.m. He appeared depressed, stressed and preoccupied: he told the waitress he and his girlfriend were breaking up due to her seeing someone else and that during a fight earlier that night, she had stabbed him in the leg. When the waitress told Joiner to report the incident to the police and seek medical aid, he nodded but said nothing. (*Id.*)

After leaving McCabe's, Joiner went to his friend Marine Sergeant Ron Current's home and they played video games. Joiner told Current he fought with Messner at about 6:00 p.m. and she stabbed him because he was trying to take away her truck keys so she would not drive drunk. Current told Joiner to call the police, but Joiner refused. Eventually, Current phoned 911 and began to report the incident. The dispatcher asked to speak with Joiner, who only spoke with the dispatcher briefly due to his difficulty speaking. Current finished filing the report and was advised that a police officer would contact Joiner at Current's home. (*Id.* at 3-4.)

At approximately 11:30 p.m., Sheriff Deputy Daniel Perkins was told to contact Joiner. He telephoned Current's house and spoke with Joiner, who informed him that between 5:30 and 6:00 p.m., Messner had stabbed him with a steak knife when he stood in the doorway to stop her from leaving. She said she would spend the night elsewhere and went to get her clothes from inside the apartment. Joiner stated that he had left the apartment and he had left afterwards. (*Id.* at 4.) Notably, Joiner told Current that his fight with Messner had a different resolution: that he left her on the floor in the hallway of their apartment. (*See* Lodgment 1-3 at 102 [Current's testimony that Joiner said during the altercation "he pretty much pushed her down and left the premises"]; *see also* Lodgment 8 at 4 n.2; ECF No. 24 at 31.)

Perkins asked Joiner to come to the police station to document his wound, but Joiner said he could not do so that night. Perkins called Messner a few times but received

no response. He also drove to her apartment and knocked on the door, but no one answered. He testified that the lights were not on in the apartment. (Lodgment 8 at 4.)

Messner did not show up to work on the morning of February 12, 2004. Messner's friend and Messner's platoon sergeant went to her apartment to check on her. Her truck was on the premises, the apartment door was locked, and no one answered their calls. They peered through a window and it appeared a bathroom light was on. They then called the police. (*Id.*)

At approximately 10:15 a.m., Deputy Sherriff Jeffrey Schmidt and other deputies responded to a call to check on Messner. They met her platoon sergeant there, knocked on the apartment doors and windows and received no response. They then obtained a pass key from the apartment manager to the unit. In the bathroom, they discovered Messner's body submerged in the water in the bathtub. "Her face was covered by a small, circular-shaped film of foam. Her hands were wrinkled, indicating she had been in the water for considerable time. There was no water on the floor, and no signs of a struggle." (*Id.* at 5.)

At approximately, 11:00 a.m., Detective Patrick Gardner was called to Messner's apartment to investigate her death. After obtaining a search warrant, investigation of the crime scene began at 6:49 p.m., during which the detectives found the home phone was working and there was no sign of forcible entry into the apartment. Further, a search of Joiner's car revealed several of Messner's identification cards, including her driver's license and Marine Corps ordnance card. (*Id.*)

As part of the investigation, Detective James Walker examined Joiner that same day. He did not find a "stab wound," but rather a "very tiny, just a little scrape" on Joiner's left thigh. There were no defensive marks on Joiner's hands or body, which was contrary to the detective's expectation given Joiner's claim that Messner had stabbed him. Detective Walker testified that Joiner had on his person the following: (1) the keys to Messner's truck; (2) Messner's A.T.M card; and (3) $43.86 in cash. (*Id.* at 5.)

At approximately, 1:00 p.m. that day, Dr. Glenn Wagner, Chief Medical Examiner for San Diego County, was called regarding Messner's death. He arrived at the crime scene at 9:30 p.m. Upon removing Messner's body from the tub, Dr. Wagner noticed that although her body was in rigor mortis, there was great mobility in her neck which was broken. He found bruised on her neck consistent with strangulation and wringing of the neck. Additionally, he found bruising on her wrist, biceps, right hip, as well as lacerations on her lips. (*Id.* at 6.)

Dr. Wagner testified Messner's broken neck would have produced instant paralysis but not death: "In the absence of anything else, we would fuse that area, and eventually sensation would return to the spinal cord. This injury itself isn't a fatal injury." (*Id.* at 6.)

Dr. Wagner could not determine whether Messner was awake or conscious when placed in the tub. He testified that Messner died by drowning, as evidenced by the pulmonary edema or foam in the bathtub, which indicated she was still alive when placed in the water. Per Dr. Wagner's testimony, death by drowning involves "a period of panic and gasping, which can be quite long, a minute and a half or longer, followed by an area of quietness and then convulsions followed by death. In most cases . . . unconsciousness takes anywhere from three to ten minutes, and death occurs in 13 minutes." (*Id.*)

Dr. Wagner testified that Messner's death "most likely, occurred either late in the evening of [February 11] or possibly in the morning hours of the 12th of February." He added, "It could certainly be three or four hours on either side" of that estimate. (*Id.*)

## II. PROCEDURAL BACKGROUND[3]

### A. Trial and Direct Appeal

On April 22, 2005, a jury convicted Joiner of first degree murder and found true the special circumstance of intentional infliction of torture pursuant to California Penal

---

[3] After conducting its own full review of the record, this Court recites the procedural background presented in the Report.

Code §§ 187(a), 190.2(a)(18). (Lodgment 8 at 1-2.) The jury deliberated for less than two hours before reaching their verdict. (*See* Lodgment 3 at 271-72.) Joiner was sentenced to a term of life without the possibility of parole and had a parole revocation restitution fine under section 1202.45 imposed. (*Id.* at 244-45.) He brought a motion for a new trial on September 30, 2005 based on alleged prosecutorial misconduct and sought dismissal of the special allegation because of insufficient evidence. (Lodgment 8 at 2; Lodgment 3 at 194-202.) The court denied the motion ruling that there was no misconduct and the special circumstance was supported by sufficient evidence. (Lodgment 8 at 2.)

On June 22, 2006, Joiner appealed his conviction contending: (1) the prosecutor committed prosecutorial misconduct during closing argument; (2) the permissive inference in CALJIC No. 2.50.02 violated Joiner's due process; (3) the special circumstance finding of torture should be reversed based on trial counsel's failure to object to a hearsay statement during a videotaped experiment simulating the circumstances of the murder; and (4) the trial court erred in ordering a parole revocation restitution fine per section 1202.45. (Lodgment 5; Lodgment 8 at 2, 14-23.) The California Court of Appeal affirmed the judgment but remanded the matter to the trial court with instruction to strike the parole revocation restitution fine as Joiner is ineligible for parole. (Lodgment 8 at 23-24.)

In its discussion of Joiner's prosecutorial misconduct claim, the California Court of Appeal held that there was overwhelming evidence of his guilt:

> Based on the totality of the evidence, we conclude there was overwhelming evidence of Joiner's guilt. Joiner admitted to several individuals that he fought with Messner around 6:00 p.m. on the day she was killed. He even told an officer that he had left her on the floor in the hallway. He used Messner's A.T.M. card to withdraw money. Despite prompting from the waitress at the club, he did not call the police earlier in the evening of February 11th. Also, when he was being investigated on February 12th, he had in his possession Messner's identification cards, including a driver's license; her A.T.M. card; and her truck keys.

Although different witnesses placed Joiner at specific locations during the evening of February 11, they did not account for the entire time period covered by Dr. Wagner's testimony regarding the time of Messner's death. Dr. Wagner did not give a specific time of death, but stated it could have occurred three or four hours before "late evening" on February 11th. Therefore, the murder could have taken place as early at 6:00 p.m., when Joiner admitted he fought with Messner.

Upon analysis of the overwhelming evidence of guilt, Joiner's alibi proves to be a flimsy construct. . . .

(Lodgment 8 at 16-17.) Joiner's petition for review was filed with the California Supreme Court on January 18, 2007 and denied on February 21, 2007. (Lodgments 9-10.)

## B.    State Habeas Corpus Proceedings

From February 6, 2008 to April 1, 2016, Joiner filed nine habeas petitions in the state trial court, five habeas petitions in the California Court of Appeal, and one habeas petition in the California Supreme Court. (*See* Lodgments 11-37.) However, he did not file a federal petition until filing the instant Petition on November 9, 2016.[4] (ECF No. 1.)

Joiner filed his first habeas petition in the trial court on February 6, 2008 in which he claimed infective assistance of his trial counsel due to counsel's failure to locate and interview an alibi witness and failure to call an expert witness regarding the victim's time of death. (Lodgment 11.) The Superior Court denied the petition on July 7, 2008. (Lodgment 12.)

Joiner filed his first habeas petition in the California Court of Appeal on May 31, 2009 in which he claimed that the medical examiner miscalculated the victim's time of

---

[4] A notice of appeal by a *pro se* prisoner is deemed constructively filed at the moment the prisoner delivers it to prison authorities for forwarding to the clerk of court. *Houston v. Lack*, 487 U.S. 266, 267 (1988). The *Houston* mailbox rule applies for purposes of calculating the one-year AEDPA limitations period as to a *pro se* prisoner's federal habeas petition and the state court habeas petition that began the period of tolling. *Anthony v. Cambra*, 236 F.3d 568, 575 (9th Cir. 2000). The Court applies this principle throughout its discussion of Joiner's filing of state and federal habeas petitions.

death. (Lodgment 13.) This petition was denied without prejudice so that Joiner could raise this claim in the first instance before the trial court. (Lodgment 14.)

Joiner filed his second habeas petition in the trial court on February 5, 2010. He asserted that a miscarriage of justice had occurred and claimed his actual innocence based on evidence regarding the victim's time of death. (Lodgment 15 [relying on victim's autopsy report and statement of Michael Focke].) On April 9, 2010, the court denied this second habeas petition as the certificate noting the victim's time of death was not "newly discovered evidence" and did not point "unerringly towards innocence." (Lodgment 16 at 2.) The trial court noted that Joiner's efforts to rely on the victim's death certificate and autopsy report which state her official time of death as February 12, 2004 at 10:05 "are baseless" as it is clear that this date and time refer to when the victim's body was found. (*Id.* at 3.) Thus, Joiner's claims had no merit. (*Id.*)

Joiner filed his second habeas petition in the California Court of Appeal on April 22, 2010 again claiming actual innocence based on evidence regarding the victim's time of death. (Lodgment 17.) In denying the petition on June 9, 2010, the court found there was no "new exculpatory evidence and the issue of sufficiency of the evidence is not cognizable on habeas corpus. . . . The evidence showed [the victim's] body was found at approximately 10:00 a.m. on February 12, 2004, and was in rigor mortis. The logical conclusion is Dr. Wagner noted the date and time the body was found in his autopsy report and the Certificate of Death." (Lodgment at 18 at 2.) Further, the Court referred to its prior finding on direct appeal that "there was overwhelming evidence of Joiner's guilt." (*Id.* at 1-2.)

On June 21, 2010, Joiner filed a third habeas petition in the trial court in which he raised the same claims he had raised in his previous petitions to the trial court. (Lodgment 19.) It was denied on July 9, 2010. (Lodgment 20.)

1    Joiner filed a fourth habeas petition in the trial court on January 18, 2011[5] and then

2    a fifth habeas petition in trial court on February 25, 2011. Both made the same claim of

3    actual innocence as his previously filed petitions. (Lodgments 21-22.)

4        Joiner then filed his sixth habeas petition in trial court on August 8, 2011.

5    (Lodgment 23.) The court denied the petition as successive on September 8, 2011.[6]

6    (Lodgment 24.)

7        On October 30, 2011, Joiner filed his third habeas petition in the California Court

8    of Appeal again claiming actual innocence based on a January 8, 2011 investigation.[7] He

9    claimed to have submitted two habeas petitions to the trial court, which had not yet been

10   ruled on. (Lodgment 25 at 6, 14.) The court denied the petition without prejudice on

11   January 31, 2012 subject to refiling once the trial court ruled on Joiner's new contentions.

12   (Lodgment 26.)

13       Joiner then filed his seventh habeas petition in the trial court;[8] it was denied on

14   April 24, 2012. (Lodgment 27.) In the order denying the petition, the trial court stated

15   that the petition "contains almost identical arguments to those [Joiner] previously made

16   before this Court and the Court of Appeal." (*Id.* at 2.)

17

18

19

20   [5] This petition was not dated.  Because it would be reasonable to assume that Joiner delivered his
     petition to prison officials for mailing, and to assume that it was done prior to the filing date, and
21   because it does not affect the outcome, this Court presumes (in Joiner's favor) that his petition was
     delivered to prison officials for mailing seven days prior to the court-stamp date.
22   [6] In its September 8, 2011 order denying Joiner's petition as successive, the trial court refers to the
     petition at issue as his "fourth" petition and does not reference Joiner's earlier petitions (noted above as
23   petitions four and five) filed on January 18, 2011 and February 25, 2011.
     [7] Petitioner's counsel had an investigator interview Linda Singley, who on January 8, 2011 recapitulated
24   that she first saw Joiner in the smoking section of the bar between 6:30 p.m. and 7:00 p.m.  (Lodgment
     25 at 8.)
25   [8] Respondent acknowledges that despite repeated requests, he has been unable to obtain a copy of this
26   specific habeas petition filed in the trial court.  (ECF No. 15-1 at 21.)  However, he was able to obtain a
     copy of the order denying the petition.  (Lodgment 27.)

27

28

On April 17, 2012,[9] Joiner filed a petition for writ of mandate seeking discovery. (Lodgment 28.) The petition was denied without prejudice on May 2, 2012 so that Joiner could show he had made good faith efforts to obtain requested discovery from counsel and was unsuccessful. (Lodgment 29.)

On July 9, 2013, Joiner filed his eighth habeas petition in the trial court, which was denied on November 14, 2013. (Lodgments 30-31.)

On December 1, 2014,[10] Joiner filed a ninth petition in the trial court. (Lodgment 32.) In this petition, Joiner for the first time relied on a newly created report by Cindy Balch, R.N., which he also relies on in the instant federal Petition, as "newly discovered evidence which demonstrates his factual innocence." (Lodgment 32 at 60-68, Ex. B; Lodgment 33 at 2.) This document "questions the victim's time of death, as well as various other aspects of the evidence in this case." (Lodgment 33 at 2.) The trial court denied the petition as none of the "newly discovered" evidence presented by Joiner undermined his conviction or pointed "unerringly to innocence or reduced culpability." (Lodgment 33 at 2.)

Joiner then filed his fifth habeas petition in the California Court of Appeal on October 1, 2015.[11] (Lodgment 34.) This petition made the same claims regarding his actual innocence relying on the report by Cindy Balch, RN. (*Id.* at 4-5, 14-15, 24-25, and

---

[9] This petition was not dated. Because it would be reasonable to assume that Joiner delivered his petition to prison officials for mailing, and to assume that it was done prior to the filing date, and because it does not affect the outcome, this Court presumes (in Joiner's favor) that his petition was delivered to prison officials for mailing seven days prior to the court-stamp date.

[10] This petition was not dated. Because it would be reasonable to assume that Joiner delivered his petition to prison officials for mailing, and to assume that it was done prior to the filing date, and because it does not affect the outcome, this Court presumes (in Joiner's favor) that his petition was delivered to prison officials for mailing seven days prior to the court-stamp date.

[11] This petition was not dated. Because it would be reasonable to assume that Joiner delivered his petition to prison officials for mailing, and to assume that it was done prior to the filing date, and because it does not affect the outcome, this Court presumes (in Joiner's favor) that his petition was delivered to prison officials for mailing seven days prior to the court-stamp date.

Ex. B [beginning on page 38].) On October 9, 2015, the court denied the petition finding it was barred as untimely given that it was filed more than ten years after Joiner was sentenced without an adequate explanation for the delay.[12] (Lodgment 35.)

Finally, Joiner filed a habeas petition on April 1, 2016 in the California Supreme Court raising the same claims as his prior habeas petition in the California Court of Appeal. (Lodgment 36.) In this petition, he included a claim alleging that constitutional error deprived the jury of critical evidence that would have established his innocence regarding the victim's time of death and invoked the "new report" of Cindy Balch, RN. (*Id.* at 46-48 [referenced as attached Exhibit B].) The petition was summarily denied on June 29, 2016. (Lodgment 37.)

## C. Instant Federal Habeas Corpus Petition

On November 9, 2016, Joiner filed the instant federal habeas Petition.[13] (ECF No. 1.) On May 2, 2017, Respondent moved to dismiss the Petition on the basis that it is untimely under the AEDPA and lodged the state court record. (ECF Nos. 15-16.) On June 2, 2017, Joiner filed his Opposition to the motion to dismiss. (ECF No. 17.)

---

[12] The court found the petition further barred because: (1) the claims had been raised and rejected on appeal; (2) the claims could have been raised on direct appeal but were not; (3) the claims were raised and rejected in a prior habeas corpus petition; or (4) the claims could have been raised in a prior petition but were not. (Lodgment 35 at 2.)

[13] In addition to his claim that "constitutional error deprived the jury of critical evidence that would have established [Joiner's] innocence," the Petition sets forth the following claims: (1) ineffective assistance of trial counsel for failing to retain an expert to investigate the victim's time of death; (2) ineffective assistance of trial counsel for failure to impeach the prosecution's expert witness regarding victim's time of death; (3) ineffective assistance of trial counsel for failing to investigate and introduce exculpatory evidence and witnesses; (4) ineffective assistance of trial counsel for failing to object to a jury instruction regarding prior domestic violence acts; (5) cumulative ineffective assistance of counsel; (6) presentation of false evidence by prosecutor in calling the medical examiner who gave the victim's time of death; (7) a second claim of presentation of false evidence regarding victim's time of death; (8) cumulative prosecutorial misconduct; (9) Joiner was denied meaningful review of claims raised in state habeas petitions; and (10) cumulative error. (ECF No. 1 at 24-25.)

## III.  STANDARD OF REVIEW

### A.  Standard of Review of Magistrate Judge's Report

The district judge must "make a *de novo* determination of those portions of the report . . . to which objection is made," and "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate."  28 U.S.C. § 636(b); Fed. R. Civ. P. 72(b).  The district court need not review *de novo* those portions of a Report to which neither party objects.  *See Wang v. Masaitis*, 416 F.3d 992, 1000 n.13 (9th Cir. 2005); *U.S. v. Reyna-Tapia*, 328 F.3d 1114, 1121-22 (9th Cir. 2003) (*en banc*).  On February 28, 2018, Joiner filed objections to the Report.  (ECF No. 24.)   Therefore, the Court makes a *de novo* review of the portions of the Report to which Joiner objects.

## IV.  DISCUSSION

### A.  One-Year Statute of Limitations Under AEDPA

Because Joiner's Petition was filed after April 24, 1996, it is subject to the AEDPA.  *Patterson v. Stewart*, 215 F.3d 1243, 1245 (9th Cir. 2001).  The AEDPA provides a one-year statute of limitations for filing a habeas corpus petition in federal court.  *Pace v. DiGuglielmo*, 544 U.S. 408, 410 (2005) (citing 28 U.S.C. § 2244(d)(1)).  The enactment of AEDPA amended 28 U.S.C. § 2244 by adding the following relevant section:

> A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitation period shall run from . . . the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review . . . .

28 U.S.C. § 2244(d)(1)(A).

Pursuant to AEDPA, Joiner had one year from the date his state conviction became final to file his Petition in federal court.  *Calderon v. U.S. District Court*, 128 F.3d 1283, 1286-87 (9th Cir. 1997), *as amended on denial of rhg. and rhg. en*

*banc, cert. denied*, 522 U.S. 1099 (1998), *overruled on other grounds by Calderon v. U.S. District Court*, 163 F.3d 530 (9th Cir. 1999), *cert. denied*, 523 U.S. 1063 (1999). In California, a petitioner's conviction becomes final ninety days after the California Supreme Court denies a petition for direct review. *Bowen v. Roe*, 188 F.3d 1157, 1158-59 (9th Cir. 1999). The one-year statute of limitations under AEDPA begins to run the day after the conviction becomes final. *See* 28 U.S.C. § 2244(d)(1); *Corjasso v. Ayers*, 278 F.3d 874, 877 (9th Cir. 2002).

As the Magistrate Judge explains, Joiner's conviction became final on May 22, 2007, and his one-year statute of limitations began to run on May 23, 2007.[14] (ECF No. 22 at 12.) Joiner does not object. (*See* ECF No. 24.) Thus, Joiner's one year statute of limitations to file a petition for writ of habeas corpus in federal court expired on May 23, 2008, over eight years before he filed his present Petition on November 9, 2016. (ECF No. 22 at 13; *see* ECF No. 24.)

However, the Court recognizes three exceptions that may permit review of a petition after the one-year limitation has expired: (1) statutory tolling under 28 U.S.C. § 2244(d)(2); (2) equitable tolling, *see Holland v. Florida*, 560 U.S. 631, 645 (2010); and, in rare and extraordinary circumstances, (3) a plea of actual innocence, *see McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013).

### 1. Statutory Tolling

The AEDPA tolls the one-year statute of limitations period for the amount of time a "properly filed application for State post-conviction or other collateral review" is pending in state court. 28 U.S.C. § 2244(d)(2); *Nino v. Galaza*, 183 F.3d 1003, 1005 (9th

---

[14] "Joiner challenged his conviction on direct appeal to the California Court of Appeal, Fourth District, Division One. The Court affirmed Joiner's conviction on December 12, 2006. The California Supreme Court denied Joiner's petition for review on February 21, 2007. After ninety days, on May 22, 2007, Joiner's conviction became final. Pursuant to section 2244(d), the statute of limitations for federal habeas corpus relief began to run on May 23, 2007, the day after the judgment became final." (ECF No. 22 at 12 (internal citations omitted).)

Cir. 1999), *overruled on other grounds by Carey v. Saffold*, 536 U.S. 214 (2002). A petitioner "bears the burden of proving that the statute of limitations was tolled." *Banjo v. Ayers*, 614 F.3d 964, 967 (9th Cir. 2010). A state prisoner who unreasonably delays in filing a state habeas petition is not entitled to statutory tolling because the petition is not considered "pending" or "properly filed" within the meaning of section 2244(d)(2). *Nedds v. Calderon*, 678 F.3d 777, 780 (9th Cir. 2012) (quoting *Carey*, 536 U.S. 214).

Joiner concedes that he is not entitled to have his Petition considered timely based on statutory tolling.[15] (*See* ECF No. 17 at 6.) Nonetheless, the Magistrate Judge provides a thorough explanation of Joiner's ineligibility for statutory tolling.[16] (*See* ECF No. 22 at 13-15.) The Magistrate Judge concludes that "statutory tolling does not permit Joiner's federal Petition." (*Id.* at 15.) Joiner does not object. (*See* ECF No. 24.) This Court has examined the Magistrate Judge's analysis and agrees that statutory tolling does not permit review of Joiner's untimely Petition.

### 2. Equitable Tolling

The one-year statute of limitations under the ADEPA may be subject to equitable tolling in appropriate cases. *Holland*, 560 U.S. at 645. To be entitled to equitable tolling, a habeas petitioner has the burden to establish two elements: (1) "he has been pursuing

---

[15] Per Joiner, "respondent erroneously contends that this petition claims that *statutory* . . . tolling makes this petition timely." (ECF No. 17 at 6 (emphasis added).)

[16] "Even a cursory review of Joiner's state habeas petition filings makes it clear that there is insufficient statutory tolling to make his federal Petition timely. As noted above, Joiner's conviction became final on May 22, 2007. The AEDPA one-year statute of limitations began to run on May 23, 2007 and expired on May 23, 2008. Joiner did not file his first state habeas petition in the trial court until February 6, 2008. As there is no tolling from the date of finality, May 23, 2007, until the filing of the first state petition, February 6, 2008, 260 days of the one-year limitations period expired; this left Joiner with 105 remaining days to file a federal habeas petition. Joiner's first state habeas petition was denied on July 7, 2008. However, 328 days elapsed between July 7, 2008 and the filing of his next state habeas petition with the California Court of Appeal on May 31, 2009. This gap is too long to provide Joiner with tolling." (ECF No. 22 at 14-15 (internal citations omitted).)

his rights diligently," and (2) "some extraordinary circumstance stood in his way." *Id.* at 649 (citing *Pace*, 545 U.S. at 418).

In his Opposition, Joiner also concedes that he is not entitled to equitable tolling.[17] (*See* ECF No. 17 at 6.)  Instead, Joiner contends that a "fundamental miscarriage of justice" warrants consideration of his untimely Petition.  (*Id.* at 6-7.)  Thus, as the Magistrate Judge explains, "Joiner claims he is actually innocent, and therefore, the actual innocence equitable exception to AEDPA's statute of limitations should allow him to have his claims reviewed."  (ECF No. 22 at 15-16 (citing ECF No. 17 at 8-16).)  Joiner does not object to the Magistrate Judge's finding that equitable tolling is not at issue here. (*See* ECF No. 24.)  This Court agrees that Joiner makes no argument for equitable tolling of his untimely Petition, thus, the Court focuses exclusively on the actual innocence exception.

### 3.    Actual Innocence Exception

### a)    Statutory Framework

The Court has examined the legal authority pertaining to the AEDPA's actual innocence exception and recites the framework provided in the Report.  (*See* ECF No. 22 at 16-17.)

In rare and extraordinary circumstances, a plea of actual innocence can serve as a gateway through which a petitioner may pass to overcome the one-year statute of limitations applicable to federal habeas petitions under AEDPA. *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013); *see also Lee v. Lampert*, 653 F.3d 929, 934-37 (9th Cir. 2011) (en banc). To show actual innocence, the petitioner must meet the threshold requirement set forth in *Schlup v. Delo*, 513 U.S. 298 (1995). This requires a petitioner to "support his allegations of constitutional error with new reliable evidence—whether it be exculpatory

---

[17] Per Joiner, "respondent erroneously contends that this petition claims that . . . *equitable* tolling makes this petition timely."  (ECF No. 17 at 6 (emphasis added).)

scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 324. Such evidence need not be newly discovered, but it must be "newly presented", meaning that it was not before the trial court. *See Griffin v. Johnson*, 350 F.3d 956, 961-63 (9th Cir. 2003).

Further, a petitioner must "persuade[ ] the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *McQuiggin*, 569 U.S. at 386 (quoting *Schlup*, 513 U.S. at 329 [noting the miscarriage of justice exception only applies to cases in which new evidence shows "it is more likely than not that no reasonable juror would have convicted the petitioner"]); *see also House v. Bell*, 547 U.S. 518, 538 (2006) (emphasizing that the *Schlup* standard is demanding and seldom met). This exacting standard "permits review only in the extraordinary case, but it does not require absolute certainty about the petitioner's guilt or innocence." *Larsen v. Soto*, 742 F.3d 1083, 1095 (9th Cir. 2013) (quoting *Schlup*, 513 U.S. at 321). Critically, "actual innocence," for purposes of *Schlup*, "means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998).

A petitioner's new evidence must be "so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error." *Schlup*, 513 U.S. at 316. The habeas court considers all evidence, both old and new, incriminating and exculpatory, admissible at trial or not, and based, "[o]n this complete record, the court makes a probabilistic determination about what reasonable, properly instructed jurors would do." *Lee*, 653 F.3d at 938 (internal quotations omitted). "Unexplained delay in presenting new evidence bears on the determination whether the petitioner has made the requisite showing" required by *Schlup*. *McQuiggin*, 569 U.S. at 399; *see Schlup*, 513 U.S. at 322 ("[a] court may consider how the timing of the submission and the likely credibility of [a petitioner's] affiants bear on the probable reliability of . . . evidence [of actual innocence].")

Precedent holding that a petitioner has satisfied the *Schlup* standard has "typically involved dramatic new evidence of innocence," such as DNA evidence or a prosecution's chief witness's subsequent open court confession that he was the perpetrator of the murder for which the petitioner had been convicted. *Larsen*, 742 F.3d at 1096. In contrast, access to the *Schlup* gateway has been denied where "a petitioner's evidence was merely cumulative or speculative or was insufficient to overcome otherwise convincing proof of guilt." *Id.* (citing as examples *Lee*, 653 F.3d at 943-46 and *Sistrunk v. Armenakis*, 292 F.3d 669, 675-77 (9th Cir. 2002) (en banc)).

### b) Magistrate Judge's Analysis

Joiner argued that "the central forensic proof connecting [him] to the crime has been called into question" by the following newly presented evidence:

(1) the victim's autopsy report completed by Dr. Wagner listing the victim's time of death as February 12, 2004 at 10:05 a.m. (ECF No. 17 at 8 (citing ECF No. 1, Ex. A);)

(2) a report by Nurse Cindy Balch dated September 9, 2014, over ten years after the victim's death, that questions the victim's time of death, as well as various other aspects of the evidence in this case (*id.* at 9 (citing ECF No. 1, Ex. B);)

(3) an affidavit of a supposedly exculpatory witness, Michael Focke, stating he spoke with the victim on February 11, 2004 between 6:00 p.m. and 7:00 p.m. (*id.* at 9-10 (citing ECF No. 1, Ex. E);)

(4) a report from a private investigator who timed the drive between the Fallbrook apartment where the victim was found and McCabe's bar in Oceanside on December 1, 2010 (*id.* at 10 (*see* ECF No. 1, Ex. G);)

(5) a February 12, 2004 investigative police report stating that a window in the apartment bedroom was not locked (*id.* at 10 (citing ECF No. 1, Ex. K);) and

(6) an affidavit from a friend of Joiner stating he was willing to testify that during an incident of prior domestic violence between Joiner and the victim discussed at trial, he saw the victim attempt to hit Joiner (*id.* at 10-11 (citing ECF No. 1, Ex. I).)

(*See* ECF No. 22 at 18.)

Joiner uses this evidence to support his arguments that (a) the victim was alive after he left the apartment; (b) testimony at trial regarding the victim's time of death was unreliable and biased based on the time of death noted on the death certificate and autopsy report; (c) there was someone else in the apartment based on the fact that a light was on in the apartment; and (d) the evidence against Joiner at trial was weak as there was no DNA evidence or eyewitness accounts linking him to the crime. (*Id.* (citing ECF No. 1 at 11-12.) The Magistrate Judge addressed each of these arguments and Joiner's accompanying new evidence.

The Magistrate Judge explained that "the crux of Joiner's alibi defense was based on a challenge to the time of death proffered by Dr. Wagner." (ECF No. 22 at 20 (citing Lodgment 1 at 657-66 (defense counsel arguing in his closing argument that based on Dr. Wagner's testimony as to the science of rigor mortis and the victim's estimated time of death, Joiner could not have been the person who killed the victim.) Specifically, the Magistrate Judge discounted Dr. Wagner's autopsy report and statements provided in Nurse Balch's report challenging the victim's time of death as evidence that was presented to the jury by Dr. Wagner's trial testimony and defense counsel's closing argument. (ECF No. 22 at 20-21.) ("the newly presented evidence regarding the victim's time of death, was information and argument the jury had before it and rejected in reaching Joiner's guilty verdict in after less than two hours of deliberation.")

Further, the Magistrate Judge found that Joiner had not established his actual innocence based on the inference that, because the bedroom window was unlocked, someone else was in the apartment who may have killed Messner. (*See* ECF No. 22 at 21.) The Magistrate Judge explains, "This is the type of merely speculative evidence that is insufficient to overcome the otherwise overwhelming proof of guilt in this case." (*Id.* (citing *Larsen*, 742 F.3d at 1096).)

The Magistrate Judge also addressed the discounted the relevance of Michael Focke's testimony that he remembered speaking with the victim between 6:00 p.m. and 7:00 p.m. in light of the strength of other evidence presented at trial. (ECF No. 22 at 21-22.) The Magistrate Judge opined, "While Focke's testimony may call into question the prosecution's timeline for the night of February 11, 2004, other testimony was presented at trial that would contradict his statement." (*Id.* at 22.) For example, other witnesses who had plans to meet Messner attempted to call her around 5:00 p.m. and, when Messner failed to meet them at 6:00 p.m. as planned, they continued to call multiple times thereafter. (*Id.*)

The Magistrate Judge found that the newly estimated drive times provided by Joiner's investigator did not foreclose the timeline presented at trial. (*Id.*) "In fact, they align with the estimated travel time provided by the prosecution during closing argument." (*Id.* (citing Lodgment 1 at 626-27 ("it takes no less than maybe a half hour from Fallbrook to downtown Oceanside," where Joiner withdrew money from Messner's credit union account at 7:30 p.m.). Also, "[w]itnesses placed Joiner at specific locations during the evening of February 11, 2004, but they did not account for the entire time period covered by Dr. Wagner's estimated time of death testimony." (ECF No. 22 at 22.) Thus, the Magistrate Judge opined that Joiner's evidence "falls short of being the type of evidence that would permit Joiner to pass through the *Schlup* gateway." (ECF No. 22 at 22.)

Moreover, the Magistrate Judge opines, "the fact that one of Joiner's friends was willing to testify that during an incident of prior domestic violence between Joiner and Messner discussed at trial, the victim tried to hit Joiner, does not prove that Joiner is actually innocent." (*Id.* at 22-23 (citing ECF No. 1 at 110-12.) The Magistrate Judge notes, "Other witnesses testified as to the nature of Joiner's relationship with Messner including past instances of possessive and violent behavior.

Finally, the Magistrate Judge observed that there was substantial evidence pointing to his guilt including *inter alia* that he admitted to multiple individuals that he fought with the victim at 6:00 p.m. the day she was killed, he provided conflicting reports regarding how the fight ended, he told authorities conflicting stories that he had gone straight to Current's house after the fight when he actually went to McCabe's bar, and most pertinently that Joiner admitted to strangling the victim and placing her in a bathtub. (ECF No. 22 at 23-24.)  Joiner "admitted that he put both hands around [the victim's] neck area and threw her down so her head hit a wall.  He finally admitted that he had put the victim in the bathtub, after she was laying motionless on the floor, pulling the stop, filling the tub with water, and then leaving.  He claimed that he left the victim's head above water and only filled the tub less than half full . . . ."  (ECF No. 22 at 25) (quoting Lodgment 3 at 16-19, 46-47).

After reviewing the trial record and Joiner's newly presented evidence, the Magistrate Judge concluded:

> The "newly presented evidence"[18] [Joiner] relies on in an attempt to demonstrate his actual innocence is precisely the type of evidence that is "merely cumulative . . . speculative . . .[and] insufficient to overcome otherwise convincing proof of guilt."  *See Larsen*, 742 F.3d at 1096. . . .  In short, Joiner's "newly presented evidence" is insufficient to allow him to pass through the *Schlup* gateway and have his constitutional claims heard on the merits.  *Lee*, 653 F.3d at 937.  Even if the Court considers the evidence that Joiner could have presented at trial, he still cannot meet *Schlup*'s exacting standard.  *See Lee*, 653 F.3d at 945.  This is not one of the extraordinary cases meriting review of Joiner's otherwise time-barred claims under the actual innocence exception to the statute of limitations.  Accordingly, Joiner is not entitled to a tolling of the AEDPA statute of limitations based on his assertion of actual innocence.

---

[18] Because it does not affect the outcome, the Magistrate Judge, as well as this Court, have assumed *arguendo* that the new evidence provided by Joiner may qualify as "newly presented" evidence of actual innocence for the purposes of the *Schlup* gateway.  *See Griffin*, 350 F.3d at 963 (*Schlup* gateway claims require only "newly presented" evidence of actual innocence; hospital records that were in petitioner's possession, but not presented at trial court prior to accepting plea bargain qualified as "newly presented" evidence for purposes of the *Schlup* gateway).  (*See* ECF No. 22 at 17 n.13.)

(ECF No. 22 at 17-18, 26.)

**B.    Joiner's Objections**

Joiner asserts the following specific objections to the Magistrate Judge's analysis of his actual innocence claim: (1) the Report relies on an erroneous state court adjudication of Joiner's claim, (2) the Report fails to properly assess the likely impact of the new evidence on reasonable jurors under *Schlup*, (3) the Report's conclusion that Joiner had not satisfied the "actual innocence" gateway is based in part on false evidence that constituted a "fraud on the court," and (4) the Report relied on factual disputes and credibility determinations that were made without the benefit of an evidentiary hearing.  (*See* ECF No. 24 at 2.)  This Court analyzes each objection in turn.

**1.    Reliance on State Court Adjudication of Joiner's Claim**

Joiner argues that the Report relies on an erroneous state court adjudication of his claims.  (ECF No. 24 at 9.)  Specifically, Joiner contends that "the innocence claim presented to the trial court was based on a freestanding innocence claim" under *Herrera*, while the instant petition is subject to a lower burden imposed by *Schlup*.  (*See id.*)

However, Joiner's argument has no grounding in the record.  Indeed, the actual innocence argument Joiner presented to the state superior court and court of appeals was predicated on *Schlup* and its progeny.  For example, in Joiner's petition for writ of habeas corpus presented to the San Diego County Superior Court, he argued, "The weight of the newly discovered evidence, in conjunction with the evidence introduced at trial proves that Joiner has met the *Schlup* gateway standard . . . ."  (Lodgment 32 at 68.)  Also, in Joiner's petition for writ of habeas corpus filed with the California Court of Appeal, he states, "The newly discovered/presented evidence is proof of petitioner's actual innocence.  In *McQuiggin v. Perkins* . . . the U.S. Supreme Court held that actual innocence, permitted petitioners to overcome procedural barriers to relief the same as under the fundamental miscarriage of justice exception, which applies where a

constitutional violation has probably resulted in the conviction of one who is actually innocence." (Lodgment 34 at 16 (internal quotations omitted);) *See McQuiggin v. Perkins*, 569 U.S. at 399 (quoting *Schlup*, 513 U.S. at 327) ("To invoke the miscarriage of justice exception to AEDPA's statute of limitations, we repeat, a petitioner 'must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence.'").

As the Magistrate Judge explains, the San Diego Superior Court found that "even assuming Joiner's evidence is new, it still does not undermine the jury's guilty verdict." (ECF No. 22 at 19.) Further, "the California Court of Appeal rebutted Joiner's claim of actual innocence based on the same alleged inaccuracies in Dr. Wagner's autopsy report regarding the victim's time of death that he relies on now." (*Id.*) Nonetheless, the Magistrate Judge proceeded with his own independent review of the record and provided a thorough analysis of Joiner's proclaimed actual innocence. (*See* ECF No. 22 at 17-26.) Therefore, this Court finds no merit to Joiner's argument that the Magistrate Judge's improperly reviewed and relied upon any erroneous state court adjudications.

### 2.    Likely Impact of New Evidence under *Schlup*

Joiner argues that the Report failed to properly assess the likely impact of the new evidence on a reasonable juror under *Schlup*. (ECF No. 24 at 10.)   Specifically, Joiner asserts that the Magistrate Judge erred in finding that the new evidence presented does not establish his innocence "[because] he is not required to show that he is "actually innocent" of the crime he was convicted of." (*Id.*)  Instead, Joiner explains, "the *Schlup* gateway standard is satisfied by the new evidence that Messner was alive after he left the apartment and that her death occurred on February 12, 2004, which undermines confidence in the outcome of the trial that was predicated on evidence that Messner died February 11, 2004." (*Id.* (internal citations omitted).)

The Court agrees with Joiner insofar as *Schlup* "does not require absolute certainty about the petitioner's . . . [actual] innocence." *Larsen*, 742 F.3d at 1095 (quoting *Schlup*,

513 U.S. at 321). Instead, *Schlup* requires a petitioner to "persuade the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *McQuiggin*, 569 U.S. at 386 (quoting *Schlup*, 513 U.S. at 329). The petitioner's burden is to demonstrate that "it is more likely than not that no reasonable juror would have convicted him." *Schlup*, 513 U.S. at 329. This burden is demanding and very seldom met. *See House*, 547 U.S. at 538.

Here, Joiner's "new evidence" attempts to raises doubt about the accuracy of Messner's time of death as presented at trial. (*See* ECF No. 24 at 10-15.) In his Objections, Joiner contends that the prosecutor told jurors that Messner died on February 11, 2004 at 6:00 p.m. (ECF No. 24 at 10.) However, this assertion is inconsistent with Joiner's own Petition, which offers a quote from the prosecutor's closing argument suggesting Messner's death may have occurred between 6:30 p.m. and 7:30 p.m. (*See* ECF No. 1 at 42.)

Joiner vehemently contends that Messner's death occurred on February 12, 2004 between 6:00 a.m. and 10:05 a.m.[19] To support this contention, Joiner offers Cindy Balch's report, as well as the Autopsy Report and Death Certificate.[20] (*See* ECF No. 24 at 10-11.) These documents were not offered during Joiner's state trial, yet, this new evidence bears no inconsistency to the evidence that was presented to the jury.[21] Indeed, Joiner's new evidence actually supports the testimony offered by the prosecution at trial.

---

[19] Joiner asserts, ". . . Messner died February 12, 2004. The time of death was 10:05 a.m. but this was an approximation and the actual time of death could have been as much as four hours before the time on the Death Certificate [10:05 a.m.] due to the four hours that it takes rigor mortis to develop." (ECF No. 24 at 12.)

[20] Joiner explains, "The Autopsy Report and Death Certificate presented by the petitioner 'bears the hallmarks of official documents, making solemn declarations or affirmations . . . for the purpose of establishing some fact,' namely the fact that Messner died February 12, 2004." (ECF No. 24 at 12 (citing *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 310 (2009).)

[21] As the Superior Court of San Diego explained, "Though additional evidence could have been presented, it would not have pointed unerringly to innocence or reduced culpability." (Lodgment 33 at 3.)

Dr. Wagner testified, that Messner died "either late in the evening of [February 11] *or possibly in the morning hours of the 12th of February* [, but] [i]t could certainly be three or four hours on either side" of that estimate. (Lodgment 8 at 6 (emphasis added).) The Autopsy Report and Death Certificate memorializes Messner's time of death as February 12, 2004 at 10:05 a.m. (Lodgment 15 at 8, 9.) Cindy Balch's report indicates that "the earliest time Messner could have died was February 12, 2004 at 6:00 a.m."[22] (ECF No. 24 at 10; *see* ECF No. 1 at 81.) Hence, by offering Balch's report, the Autopsy Report, and the Death Certificate, Joiner merely presents evidence that is cumulative and only substantiates evidence which was already before the jury.

Yet, for the purpose of a *Schlup* analysis, this Court has a more expansive perspective from which to review Joiner's claim of actual innocence. *See Lee*, 653 F.3d at 938. As Joiner points out, it is "this Court's role to consider *all* evidence and make a 'probabilistic determination about what reasonable, properly instructed jurors would do [on a] complete record.'" (ECF No. 24 at 15-16;) *see id.* In doing so, the Court may consider both admissible and inadmissible evidence. *Lee*, 653 F.3d 938. However, this holistic review only cuts further against Joiner's claim to innocence.

During an interview after being advised of his *Miranda* rights, Joiner "admitted that he put both hands around [the victim's] neck area and threw her down so her head hit a wall. He finally admitted that he had put the victim in the bathtub, after she was lying motionless on the floor, pulling the stop filling the tub with water, and then leaving [the apartment]. He claimed that he left the victim's head above water and only filled the tub less than half full . . . ." (Lodgment 3 at 52-53.)

---

[22] The Court also considers the timing of Cindy Balch's report in weighing its reliability. The report was dated September 2014 (over ten years after Messner's death). (ECF No. 1 at 87;) *See Schlup*, 513 U.S. at 322 ("[a] court may consider how the timing of the submission and the likely credibility of [a petitioner's] affiants bear on the probable reliability of . . . evidence [of actual innocence].")

3:16-cv-02841-GPC-BGS

Joiner challenges the Magistrate Judge's failure to mention "the fact that, prior to giving his statement to the authorities . . . , [Joiner] was informed by Ronald Current that Messner had died."[23]  (ECF No. 22 at 16.)  Joiner further contends that he "subsequently had a complete breakdown in the interview room and was willing to say *anything* that the detectives wanted him to[,] including the alleged confession[,] which was based on suggestive facts that the detectives supplied him with."  (ECF No. 24 at 16 (emphasis added).)  To bolster this argument, Joiner supplies the Court with a transcript of his conversation with Ronald Current at the Fallbrook Police Station on February 12, 2004 (ECF No. 24 at 28-33,) as well as the transcript of his interview with homicide detectives, Jim Walker and Dave Martinez, that same day (*Id* at 34-89.)

After a thorough review of these transcripts, the Court recognizes that Current had informed Joiner that Messner was dead prior to his interview with detectives.  However, the Court also observes that Joiner did not simply say "*anything*" to the detectives – he provided them with a detailed account of Messner's murder that bore exacting consistency with Dr. Wagner's autopsy findings,[24] which had not even been completed at the time Joiner gave these statements.[25]  Joiner admitted he "grabbed [Messner's] throat" and "threw her down" against a wall.  (ECF No. 24 at 30, 53.)  Per Joiner, Messner was still alive but unconscious and motionless before he placed her in a bathtub with water

---

[23] Ronald Current is a friend of Joiner, who served with Joiner in the U.S. Marine Corps.  (*See* ECF No. 24 at 91 (letter purportedly written by Ronald Current, describing his relationship with Joiner).)

[24] The Court notes that Joiner does not challenge Dr. Wagner's findings as to Messner's cause of death – drowning as determined by the foam around her mouth, nor does Joiner challenge Dr. Wagner's assessment of Messner's "washerwoman hands" as indicative of the duration of time she was submerged in water.  (*See* ECF No. 24 at 11.)  He challenges these findings only to the extent they were used to calculate of Messner's time of death.  (*See id.*)  Further, Joiner does not challenge the fact that Messner's neck was broken with accompanying bruises consistent with "strangulation and wringing of the neck."  (Lodgment 8 at 6.)

[25] The interview was conducted at 6:03 p.m. on February 12, 2004, while the autopsy was conducted at 1:00 p.m. on February 13, 2004.  (*See* ECF No. 24 at 34; Lodgment 15 at 9; *see also* ECF No. 24 at 79-80.)

and left the apartment.[26] (*See* ECF No. 24 at 38, 60-65.) The comparison to Dr. Wagner's findings is nearly indistinguishable - Messner was strangled, suffered a paralyzing broken neck, and subsequently drowned in the bathtub of the apartment she shared with Joiner.[27] (Lodgment 15 at 10.)

The Court finds no indication that the detectives suggested any of these facts to Joiner. Joiner made exacting statements about the placement of Messner's body in the bathtub. The detectives never made mention of the bathtub until after Joiner stated "I put her in the bathtub." (ECF No. 24 at 61.) Also, detectives made no reference to Messner's neck injuries until after Joiner demonstrated the manner in which he grabbed Messner during their altercation and said, "I grabbed her toward her neck." (*Id*. at 52.) Hence, the Court finds no suggestive influence by detectives as Joiner contends in his Objections. (*See id*. at 8.)

Joiner also argues that Michael Focke's testimony "casts doubt on [his] conviction that was based on testimony that Messner died February 11, 2004." (*Id*. at 14-15.) In his affidavit, Focke states that he spoke with Messner on February 11, 2004 between 6:00 p.m. and 7:00 p.m. (ECF No. 17 at 9-10 (citing ECF No. 1 at 97).) In his Objections, Joiner repeatedly emphasizes the notion that "Focke talked to Messner *as late as* 7:00 p.m. on February 11, 2004." (ECF No. 24 at 15, 17, 19 (emphasis added).) He contends, "There is no argument that can be made to account for the simple fact that Michael Focke

---

[26] Joiner explained to the detectives that after Messner hit the wall, Joiner "[knew] she was still alive" because he she was still breathing and he checked her pulse. (ECF No. 24 at 62, 64, 65.) However, "she wasn't moving" and "her eyes were closed." (*Id*. at 63.) Joiner stated, "I put her in the bathtub." (*Id*. at 61.) Afterward, Joiner left the apartment and did not see Messner again after the incident. (*See id*. at 38, 60.)

[27] Per Dr. Wagner's autopsy report, "the overall findings indicate death by drowning, and incapacitation by manual strangulation and cervical spinal cord injury." (Lodgment 15 at 10.) Messner "was found submerged fully clothed in the bathtub." (*Id*.)

talked to Messner *as late as* 7:00 p.m." [28]  (*Id.* at 15 (emphasis added).)  However, Joiner fails to address the fact Focke may have talked to Messner *as early as* 6:00 p.m. on February 11, 2004, and that Joiner's own statements place him with the victim at that time.  (*See* ECF No. 1 at 97; Lodgment 1-5 at 52.)  As the Magistrate Judge explains, "Given the overwhelming evidence of guilt in this case, this 'exculpatory' witness testimony is not the type of evidence that is sufficient to convince a reasonable juror that Joiner is not guilty."  (ECF No. 22 at 22.)  This Court agrees.

The Magistrate Judge suggested that, in light of Joiner's confession, it would be impossible for Joiner to provide any new evidence that would satisfy his burden.  (*See* ECF No. 24 at 15, *objecting to* ECF No. 22 at 25.)  While it may not be a complete impossibility as the Magistrate Judge suggests, this Court finds that Joiner certainly has not provided adequate new evidence in the instant Petition to overcome these detailed inculpatory statements.  Hence, Joiner has failed to demonstrate that, on a complete record and in light of his new evidence, "it is more likely than not that no reasonable juror would have convicted him."  *See Schlup*, 513 U.S. at 329.

### 3.    False Evidence as a 'Fraud on the Court'

Next, Joiner objects to the Magistrate Judge's alleged reliance on false evidence in reaching the conclusion that Joiner had not satisfied the *Schlup* standard. [29]  (ECF No. 24 at 18.)  Joiner further contends that the Magistrate Judge erred by failing to "make a finding whether the trial was free of non-harmless constitutional error as the constitutional error finding is not severable from an actual innocence claim under *Schlup*."  (*Id.*)

---

[28] The Court notes that, at trial, the prosecution did offer an argument that would be consistent with Focke's testimony.  During closing arguments, the prosecutor suggested that Messner may have died sometime between 6:30 p.m. and 7:30 p.m. on February 11th.  (*See* ECF No. 1 at 42.)

[29] Referring to Dr. Wagner's testimony, Joiner states that "the prosecutor not only knowingly presented false testimony but he allowed this testimony to go uncorrected[,] violating petitioner's right to due process of law."  (ECF No. 24 at 19.)

In order for the court to conclude that a non-harmless constitutional error has occurred, the petitioner must provide it with "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 324. A petitioner's new evidence must be "so strong that a court cannot have confidence in the outcome of the trial . . . ." *Schlup*, 513 U.S. at 316. A conviction based on false evidence may give rise to a non-harmless constitutional error. *See Napue v. Illinois*, 360 U.S. 264, 269 (1959) ("a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction").

Joiner alleges that the false evidence offered at his trial was Dr. Wagner's "lie," stating that Messner died on February 11, 2004. (ECF No. 24 at 18.) Joiner argues that "Dr. Wagner gave the jury the impression that, upon completing the autopsy, the reliable principles and methodologies used to determine the time of death lead him to the conclusion that Messner died on February 11th." (*Id.* at 18-19.) Joiner further contends that "[t]he prosecutor . . . consistently misrepresented the truth when he told the jury that Messner's death occurred at 6:00 p.m. on February 11, 2004." (ECF No. 24 at 20.) However, it is Joiner who fundamentally misrepresents the truth about Dr. Wagner's trial testimony. Again, Dr. Wagner testified that Messner's death "most likely, occurred either late in the evening of [February 11] *or possibly in the morning hours of the 12th of February*," adding "It could certainly be three or four hours on either side" of that estimate. (Lodgment 8 at 6 (emphasis added).) The Court reiterates that the new evidence offered by Joiner only further supports the credibility of Dr. Wagner's testimony. Again, Cindy Balch's report, the Autopsy Report, and the Death Certificate all provide an estimated time of death within the range Dr. Wagner testified to at trial – the morning of February 12, 2004. Therefore, the Court concludes that Joiner's conviction was not predicated on false evidence.

Joiner argues that the prosecutor's statements, coupled with Dr. Wagner's alleged false testimony constitute a "fraud on the court."[30]  (*See* ECF No. 24 at 20.)  However, Joiner himself concedes that his own offering of Messner's time of death (February 12th between 6:00 a.m. and 10:05 a.m.) is merely "an approximation" and although "it is virtually impossible to determine an exact time of death in unwitnessed deaths[,] there is certainly a window that can be established utilizing reliable scientific principles and methodology." (ECF No. 24 at 12.)  Hence, the Court cannot ascribe to Joiner's subsequent argument that the prosecution's educated *approximation* of Messner's death equates to a fraud on the court when that approximation was based on the scientific principles and methodology offered by Dr. Wagner.[31]  (*See* ECF No. 1 at 42.)  This is especially so when Joiner's "new evidence" substantially supports Dr. Wagner's testimony that Messner may have died "early February 12th." (*See* Lodgment 8 at 6.) Thus, the Court also finds no fraud on the court.

Joiner once again contends that "the affidavit from Michael Focke proves that Messner was alive *as late as* 7:00 p.m., when the trial record established that the petitioner was 26 miles away at McCabe's bar in Oceanside." (ECF No. 24 at 19 (internal citations omitted) (emphasis added).)  The Court reiterates that Focke's affidavit indicates he may have spoken to Messner *as early as* 6:00 p.m.  (*See* ECF No. 1 at 97.)

---

[30] Joiner also refers to the prosecutor's conduct as "egregious and highly damaging prosecutorial misconduct."  (ECF No. 24 at 20.)

[31] In his Petition, Joiner provides the following account of the prosecutor's closing argument: "When do you think she died?  You can check your notes.  Check the notes of the other jurors and if you can't come to an agreement, go ahead and ask for a read back of Dr. Wagner's testimony.  What did he say? Sometime in the late evening hours-this is his estimate and it's not an exact science . . . He estimated late evening, early morning the next day, February 11th to the 12th. . . . I asked him, 'What's your comfort range within that area?'  'Three to four hours.'  That's easy.  Do the math.  Late evening on the 11th, go back four hours 6:30 or 7:00 o'clock." (ECF No. 1 at 42 (internal citation omitted).)

At trial, Joiner was placed at McCabe's bar between 6:00 p.m. and 7:30 p.m.[32]  Hence, Focke's testimony does not disrupt the timeline presented at trial and it is not strong enough to undermine this Court's confidence in the outcome of Joiner's trial.[33]  *See Schlup*, 513 U.S. at 316.

In sum, this Court has concluded that Joiner's trial was free from non-harmless constitutional error, it rejects Joiner's claim that he was convicted on false evidence, and it finds no showing of a fraud on the court.[34]

### 4.    Factual Disputes and Credibility without an Evidentiary Hearing

Joiner objects to the Magistrate Judge's findings that were made without holding an evidentiary hearing.  (ECF No. 24 at 22.)

As the Magistrate Judge explains, "[a]n evidentiary hearing may be conducted for an actual innocence claim when it 'would produce evidence more reliable or more probative.'"  (ECF No. 22 at 26 (quoting *Griffin*, 350 F.3d at 966).)  "However, an evidentiary hearing is unnecessary if the petitioner 'has failed to show what an evidentiary hearing might reveal of material import to his assertion of actual innocence.'"  *Id.*  Contrary to Joiner's argument that "questions of credibility are only resolved through a hearing," (ECF No. 24 at 23,) "credibility may be determined without an evidentiary hearing where it is possible to conclusively decide the credibility question based on

---

[32] Although the investigative report calculates that the twenty-two mile distance between Joiner's apartment and McCabe's bar requires an approximate 35 to 46 minute drive, the evidence nonetheless remains consistent with the prosecutor's timeline.  (*See* ECF No. 1 at 103.)

[33] Joiner also argues, "Had the jury been aware of all the facts surrounding Messner's murder, it would have been presented with significant doubts about [Joiner's] guilt."  (ECF No. 24 at 22.)  Yet, *all* the facts and evidence would have included Joiner's confession to homicide detectives, (*id.* at 34-89,) which was not presented at trial even though it was deemed admissible when the trial court denied Joiner's motion to suppress the statements.  (*See* ECF No. 22 at 25.)  The Court finds it unlikely that, given his confession, any reasonable jury would have significant doubts about Joiner's guilt and, in fact, the confession further reinforces this Court's confidence in the outcome of Joiner's trial.

[34] Joiner further claims that ineffective assistance of counsel led to the damaging decision not to present any defense witness.  (ECF No. 24 at 21.)  However, this Court is not obliged to address the merits of Joiner's ineffective assistance of counsel and/or his prosecutorial misconduct claims because Joiner has not met the *Schlup* threshold.  *See Schlup*, 513 U.S. at 314-15.

documentary testimony and evidence in the record." *Smith v. McCormick*, 914 F.2d 1153, 1170 (9th Cir. 1990); *see also Watts v. U.S.*, 841 F.2d 275, 277 (9th Cir. 1988) (asserting that although issues of credibility are uncommonly resolved on the basis of affidavits, "we find that this is one of those cases in which an issue of credibility may be conclusively decided on the merits on the basis of documentary testimony and evidence in the record [which undermined petitioner's claim].").

Joiner argues that an evidentiary hearing is necessary to make a credibility determination about Dr. Wagner "because [he] has not been called upon to testify under oath why his testimony changed from the Autopsy Report and Death Certificate." (ECF No. 24 at 23.) However, as this Court has explained, Dr. Wagner's testimony is not inconsistent with the Autopsy Report and Death Certificate.[35] Hence, a comparison of the trial record to Joiner's new evidence not only undermines Joiner's claim to innocence, but indeed, it appears to bolster Dr. Wagner's credibility. Joiner also contends that an evidentiary hearing is required because, although the state court rejected his claim as to actual innocence, it did not make a factual finding as to whether false testimony was proffered. Yet, in its discussion of Joiner's third objection above, this Court concluded that no false testimony was proffered.[36] Therefore, the Court finds that Joiner has failed to show what an evidentiary hearing might reveal of material import to his assertion of actual innocence. *See Griffin*, 350 F.3d at 966. Accordingly, the Court **ADOPTS** the Magistrate Judge's Recommendation to **DENY** Joiner's request for an evidentiary hearing.

---

[35] Dr. Wagner's testimony, as well as the Autopsy Report and Death Certificate, all provide an estimated time of death in the morning hours of February 12th, 2004. (See Lodgment 8 at 6; Lodgment 15 at 8, 9.) Hence, there is no indication that Dr. Wagner committed perjury as Joiner claims. (*See* ECF No. 24 at 23.)

[36] The new evidence offered by Joiner, Cindy Balch's report, asserts that Messner likely died between 6:00 a.m. and 10:00 a.m., which only further supports the credibility of Dr. Wagner's testimony. (*Compare* ECF No. 1 at 81, *with* Lodgment 8 at 6.) Hence, Joiner has not shown that his conviction was predicated on false testimony.

## C.     Certificate of Appealability

Pursuant to Rule 11 of the Rules following 28 U.S.C. section 2254, which was amended effective December 1, 2009, a district court now "must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." A state prisoner may not appeal the denial of a section 2254 habeas petition unless he obtains a certificate of appealability from a district or circuit judge. 28 U.S.C. § 2253(c)(1)(A); *see also United States v. Asrar,* 116 F.3d 1268, 1269–70 (9th Cir.1997) (holding that district courts retain authority to issue certificates of appealability under AEDPA). A certificate of appealability is authorized "if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To meet this threshold showing, petitioner must show that: (1) the issues are debatable among jurists of reason, (2) that a court could resolve the issues in a different manner, or (3) that the questions are adequate to deserve encouragement to proceed further. *Lambright v. Stewart,* 220 F.3d 1022, 1025 (9th Cir.2000) (citing *Slack v. McDaniel,* 529 U.S. 473, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000); *Barefoot v. Estelle,* 463 U.S. 880, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983)).

As dismissal of this petition constitutes a "final order adverse to the applicant," the Court must decide whether to grant petitioner a certificate of appealability.  Based on this Court's review of the Magistrate Judge's Report, petitioner's objections thereto, and the entire record in this matter, this Court finds that no issues presented are debatable among jurists of reason, a court could not resolve the issues in a different manner, and that the questions presented are not adequate to deserve encouragement to proceed further. Accordingly, the Court will **DENY** a certificate of appealability.  *See Morales v. Adams*, No. 8CV0705 JAH (PCL), 2010 WL 2628743, at *4 (S.D. Cal. June 28, 2010).

**CONCLUSION**

Based on the foregoing reasons, the Court finds that Joiner's Petition for Writ of Habeas Corpus is time-barred pursuant to the AEDPA. Further, the Court finds no applicable exception—including actual innocence—that would toll the statute and permit review of Joiner's Petition on the merits despite its untimeliness. Therefore, the Court **OVERRULES** Petitioner's objections to the Magistrate Judge's Report and Recommendation, **ADOPTS IN FULL** the Report (ECF No. 22) and will **GRANT** Respondent's Motion to Dismiss (ECF No. 15) and **DISMISS** Joiner's Petition for Writ of Habeas Corpus (ECF No. 1) with prejudice. The Court will **DENY** a Certificate of Appealability. The Clerk of Court shall close the case.

**IT IS SO ORDERED.**

Dated: March 26, 2018

Hon. Gonzalo P. Curiel
United States District Judge

3:16-cv-02841-GPC-BGS